# Case of Hummel and Bishoff.

The supreme court possesses a superintending jurisdiction over the proceedings of the court of common pleas to punish for contempt; and a writ of certiorari is the appropriate mode of bringing the matter before this court.

County commissioners are "officers" within the meaning of the act of the 16th of June 1836, restricting the powers of the several courts to issue attachments and to inflict summary punishments for contempts of court.

That interrogatories be administered to a person charged with a contempt of court, is not an indispensable part of the proceeding.

WRIT of error to the court of common pleas of *Dauphin* county, to remove their record in a certain proceeding against David Hummel and John Bishoff, commissioners of Dauphin county, for a contempt, under the following circumstances:—

At August sessions, 1839, of the court of quarter sessions of Dauphin county, the court sustained a challenge to the array of grand and petit jurors, in consequence of a failure by the sheriff and commissioners of the county to make the selection of jurors for the service of the year 1839, in the manner directed by law. In noticing the irregularities which characterized the selection, the court, in giving their opinion on that occasion, observed: " It appears to the court in the present case, that the following irregularities occurred in making the selection of jurors for the service of the year 1839.

" 1. The act of assembly requires that the sheriff and commissioners, under the oath which it prescribes, shall every year

select from the taxable inhabitants a sufficient number of sober, intelligent and judicious persons to serve as jurors of the several courts of such counties for the ensuing year, and that sufficient number is to be so regulated, that at the end of the year there shall remain in each wheel as near as may be the number of names requisite to compose the panels of jurors for one court at least, and not any greater number. See sections 85 and 89.

" Here nine hundred and fifty was agreed upon as about the requisite number. It appears that one thousand three hundred, or one thousand four hundred were selected by the sheriff and commissioners, and then some four hundred of the jurors, whose names were actually on the ballots folded up, were drawn out of the number selected, not from the wheel, but from heaps on the table, into which the names in the respective townships were thrown, where all the ballots were exposed to the view, when part were removed, and the balance only were deposited in the jury wheel. This is not the mode of selection which the act directs. The sheriff and commissioners are to pass judgment on each person in making the selection, and not submit it to lot, and especially to a lot so objectionably conducted."

Pursuing the directions of the 93d section of the act of 14th April 1834, the court, on the 26th of August 1839, made the following order: "And now, to wit, August 26th 1839, the court having quashed the array of jurors at this court, by reason of irregularity in the selection of persons, and depositing their names in the wheel, the sheriff and commissioners, are ordered by the court forthwith to take out of the wheel, from which such jurors were drawn, all the names therein deposited, and make a new selection of persons, and deposite their names in the wheel for the remainder of the current year, in the manner directed by the act of 14th of April 1834," a copy of which order was certified by the Prothonotary, and delivered to the sheriff and commissioners of Dauphin county.

This court, in consequence of the challenge to the array of jurors being sustained, could hold no court, as usual, for the trial of causes by jury, on the fourth Monday of August 1839, and to prevent the interests of suitors from suffering by delay, appointed an adjourned court for the trial of causes, to be held on the 14th of October 1839, and a trial list was made out for such adjourned court. Upon the 10th day of September 1839, the prothonotary issued the usual *venire facias*, directed as follows:

Dauphin county, ss.—The commonwealth of Pennsylvania to the sheriff and commissioners of the said county, greeting:—We command you and every of you, that in your proper persons you draw from the wheel containing the names of the persons selected according to law, to be jurors in the courts of said county, the names of thirty-six persons, to be jurors in our county court of common pleas, to be holden at Harrisburg, in and for said county,

IX.—2 L

the 14th day of October next," &c. The writ then commanded the sheriff to summon the persons so drawn, &c.

On the 14th of October 1839, the sheriff returned the said writ of *venire*, with this endorsement thereto: "No selection having been made for causes which appear on the order of court, no jury could be summoned; so answers Wm. Cochran, sheriff." And to the said order of court the said sheriff made the following return:

"That in obedience to the within order, the sheriff and commissioners met at the commissioners office in Harrisburg, on the 23d September 1839, to select from the taxable inhabitants of Dauphin county a jury to put in the wheel, agreeably to within order. They first proceeded to empty the wheel of its contents. The undersigned proposed to destroy the old tickets. Mr. Hummel, one of the commissioners, objected, and they were placed into a box and left in the commissioners' office.

" They then proceeded to fix on the number of jurors wanted for the time specified in the within order. Taxables in the county, six thousand two hundred and sixty-two; seven to every one hundred taxables, amounting to four hundred and forty-two, the number required by law. The undersigned moved to proceed to the selection of four hundred and forty-two jurors, for the purpose of filling the wheel. Mr Hummel, one of the commissioners, agreed to select, but wished to select a greater number than was wanted, and then draw out of that number, when in the wheel, tickets enough, until reduced to the proper number. The undersigned and Mr Whitley, one of the commissioners, objected as not being in accordance with the provisions of the act of assembly. Adjourned.

" Met again at half-past two.—Messrs Hummel and Bishoff, two of the commissioners, adhered to their previous determination. The undersigned and Mr Whitley still objecting, no selection was made. Adjourned.

"September 24th 1839, met agreeably to adjournment at nine o'clock.—The undersigned moved to proceed to the selection of jurors. Agreed to. Bishoff and Hummel, two of the commissioners, refused to select, unless in the old way; that is, to select double the number required, and then draw from the wheel until reduced to the necessary number; the undersigned and Mr Whitley dissenting. Hummel proceeded to select, and Bishoff did the same. The undersigned and Whitley proceeded to select one half of the jurors wanted. Adjourned.

" Met again at three o'clock; all present.—The undersigned and commissioner Whitley, having selected from the duplicates the one half of the jurors wanted, proceeded to write the tickets to be put in the wheel. After writing for some time, the undersigned observed to Hummel and Bishoff that they should be preparing their tickets. Mr Hummel replied that he had not finished his selection, having been engaged in looking over the duplicates.

[Case of Hummel and Bishoff.]

The undersigned repeated his request to Hummel and Bishoff to proceed with writing the tickets. Mr Hummel replied that he would not select in any other than the old way, as it had been done before. The undersigned then moved to proceed to the selection of jurors according to the act of assembly; that is, select a sufficient number of sober, intelligent and judicious persons to serve as jurors. The vote being taken, the undersigned and commissioner Whitley voted in the affirmative; and Messrs Hummel and Bishoff, two of the commissioners, voted in the negative. Mr Hummel then moved to proceed to select from the list of taxables all that were thought fit for jurors, write them on tickets, put them in the wheel, draw out the superfluous number, and adopt those remaining in the wheel as jurors. The vote being taken, Messrs Hummel and Bishoff voted in the affirmative; the undersigned and Mr Whitley in the negative. Messrs Hummel and Bishoff then left the room, and for want of a quorum the undersigned and Mr Whitley were compelled to retire without effecting a selection."

Upon these returns being made to the court, the sheriff was called into court and sworn to their truth, and it was ordered by the court, that the said John Bishoff and David Hummel, two of the commissioners of the said county of Dauphin, do show cause before this court, on the third Monday of November, then next, at ten o'clock, A. M., why an attachment should not issue against them for contempt of this court, in neglecting and refusing to obey the said order and process of this court.

On the third Monday of November 1839, the said rule was returned to the court, with proof of the service endorsed thereon, as having been made upon David Hummel, upon the 15th day of October, and upon John Bishoff, upon the 16th day of October, last past, and the case was held under advisement until the next day, to wit: the 19th day of November 1839, when the respondents appeared, and by their counsel William B. Reed and Thaddeus Stevens, Esquires, read and filed the following answer to the said rule, to show cause.

"John Bishoff and David Hummel, two of the commissioners of Dauphin county, on whom a rule of said court, made the 14th of October 1839, has been served, requiring them to show cause why an attachment should not issue against them for a contempt of said court, protesting earnestly against the jurisdiction and authority of the court to make any such rule on them, and denying wholly any responsibility, as officers of the court or otherwise, in the mode now claimed, for answer thereto represent the facts as they occurred in the commissioners' office of said county, as contained in the minutes kept by their clerk hereunto appended, and to be taken as part of this their answer.

"The said John Bishoff and David Hummel entirely disclaim the commission of any act of contempt to the court in the premises, having been anxious throughout to facilitate the business of the

county, for the transaction of which they are agents duly authorized to act in common with the court and its officers. They deny ever having disobeyed the order of the court made on the 26th of August 1839; but on the contrary, assert that they strictly and literally obeyed it, so far as they were enabled to do so. That in pursuance of said order, the then sheriff, William Cochran, and commissioners Michael Whitley and the undersigned met, and without unnecessary delay, took out all the names deposited in the wheel from which jurors had been drawn, as directed by said order.

" That your respondents were desirous of complying fully with the said order, by making a new selection in the manner directed by the act of the 14th of April 1834, which requires them, in the words of the oath they had taken, ' to use their utmost endeavours and diligence in making an impartial selection of competent persons for jurors, and not to suffer partiality, favour, affection, hatred, malice or ill-will to influence them.'

" That, notwithstanding this oath, taken as well by William Cochran and Michael Whitley as by the undersigned, the said William Cochran, on two different occasions during the session of the board, made a proposition in the following words:

" ' I propose that we select from the duplicates of each township only such a number of names of persons for jurors as will, according to its ratio of taxable inhabitants, be sufficient for the balance of the year 1839: that Messrs Bishoff and Hummel select the one half of *their party*, and that Mr Whitley and myself select the other half of *our party;*'

" And refused to select a jury in any other way. Your respondents then believed, and still believe, that such a mode would be unjust and contrary to law; having yet to learn that political bias was part of the qualification of a juror, or that in preparing a panel any distinction could be legally made between individuals of one party or another. In consequence of Mr Whitley uniting in opinion with William Cochran, and the undersigned being unable to agree to it, no new selection of jurors was made, as they submit, without fault on their part.

" The undersigned do not deny that they preferred the mode heretofore uniformly practised in this county by sheriffs and commissioners of all parties, including Michael Whitley and William Cochran, in selecting jurors. It is, in their opinion, the only fair mode. Nor do they find in the order of the court, under which alone they were called on to act, any thing to prevent their adopting it. It was not adopted in this instance, because Mr Whitley and William Cochran refused to agree to any other mode than the one they had suggested.

" Under no circumstances, therefore, is the neglect or refusal to make a new selection imputable to them."

This answer was verified by the oaths of the respondents, and accompanied by a journal or minute of their proceedings, kept by

Henry Peffer, who was the clerk of the commissioners on that occasion.

Mr Johnson, the attorney-general, appeared in support of the rule, and called and examined William Cochran, Esq., the late sheriff, and Colonel Michael Whitley, the late commissioner. On the other hand, Messrs Reed and Stephens, on the part of the respondents, called and examined Mr Henry Peffer, whose testimony varies essentially from that of the other two witnesses.

After hearing the testimony, the matter was argued by the respective counsel. For the commonwealth it was urged, first, that the respondents, as officers of the court, were bound to obey its orders and process, are answerable to the summary process of attachment for contempt; and secondly, that if so, the respondents have been guilty of an actual contempt by a pertinacious refusal to obey the order and process in the present case.

Both these propositions were controverted on the part of the respondents, who contended,

1. That the court had no power to issue the attachment against them for want of jurisdiction. That if they have offended, they are only answerable to an indictment; and,

2. That if the court had power, this is not a case for its exercise, as the respondents have not been guilty of any offence.

*Porter*, president, delivered the following opinion:

" By the common law of England, which forms a part of the law of Pennsylvania, so far as the same is applicable to our situation, and is compatible with our institutions, and which in regard to the doctrine of contempts of court remained the law of Pennsylvania until it was altered by our act of assembly of the 3d of April 1809, 5 *Smith's Laws*, 55, contempts of court were punishable by the summary process of attachment, and they embraced as well constructive contempts, such as were committed out of court by publications in newspapers, and otherwise scandalizing the court itself, abusing parties who are concerned in causes there, and prejudicing mankind against persons before a cause is heard, as also, the disobedience of the process and orders of the court by parties, jurors, witnesses, officers, or others from whom the law required obedience to the orders, decrees, judgment, or processes of the court. This summary power in the courts was as old as the law itself, and when prudently and properly exercised, did injury to no one, and was exercised as well by the courts of England as of this country, up to the year 1809.

" The supreme court of Pennsylvania exercised the power thus to punish constructive contempts by improper publications before the revolution, when Kensey, C. J. presided in that court.

" Again, in the year 1788, in the case of The Commonwealth *v.* Oswald, when M'Kean, C. J. presided; and again, in the case of The Commonwealth *v.* Passmore, in 1802, when Shippen, C. J. presided.

IX.—2 L*

[Case of Hummel and Bishoff.]

"The decisions in the cases of Oswald and Passmore created no little sensation in the public mind. The publication in the former case referred directly to the proceedings in a suit depending between a Mr Brown and the respondent, and reflected upon the character and conduct of the judges of the supreme court, and was punished by that court as a contempt, by subjecting the respondent to a fine of 10 pounds, and an imprisonment for thirty days. A complaint was preferred by the respondent to the legislature against the judges, asking for their impeachment for this sentence as an act of arbitrary power. Upon a full hearing, and an able argument of the question, the house of assembly, by a vote of thirty-four to twenty-three, came to the following decision:

"'*Resolved*, That this house having, in committee of the whole, gone into a full examination of the charges exhibited by Eleazer Oswald of arbitrary and oppressive proceedings in the justices of the supreme court against the said Eleazer Oswald, are of opinion that the charges are unsupported by the testimony adduced, and consequently that there is no just cause for impeaching the said justices. (See a very interesting report of the proceedings in 1 *Dall.* 350—360.)

"In Passmore's case, the publication complained of contained no reflection upon the court, but was a libellous charge againt the defendants, in an action brought by Passmore in the supreme court, charging them with having sworn to what was not true in an affidavit, &c. The publication did not in terms refer to any suit depending, but the affidavit in question was one verifying exceptions to a report of referees in that action. The court proceeded against him summarily by attachment for contempt, and fined him 50 dollars, and ordered him to be imprisoned for thirty days. Mr Passmore complained to the legislature against C. J. Shippen and justices Yeates and Smith, for this proceeding against him, which resulted in an impeachment preferred by the house of representatives against these judges on the 23d of March 1804. They were tried before the senate, in January 1805, and on the 26th of that month acquitted by a vote of thirteen senators pronouncing them guilty, and eleven pronouncing them not guilty, the constitution requiring two-thirds of the members present to convict. The house of representatives averred, in the articles of impeachment, that 'the sentence of fine and imprisonment, under all the circumstances of the case, was arbitrary and unconstitutional, and a high misdemeanor,' &c.

"1. Because the publication did not reflect on the judges in their judicial capacity nor personal character.

"2. Because there was no direct allusion in the paper called a libel, to any cause depending before the court.

"3. Because it appears from the record that the said Thomas Passmore was warranted in the conclusion that the suit between him and Pettit and Bayard was then ended, judgment having been entered and execution issued, &c.

[Case of Hummel and Bishoff.]

" 4. Because it appears from the evidence that the court were satisfied with the answers of Thomas Passmore, to the interrogatories, so far as respected the alleged contempt against themselves.

" 5. Because it appears that the punishment was inflicted not because he had committed a contempt of court, but because he would not apologise or make atonement to Mr Andrew Bayard, as the court had expected. This case will be found reported, so far as the proceedings in the supreme court are concerned, in 3 *Yeates* 438, and as to the impeachment, in the report of the trial of the judges, published by W. Hamilton, Lancaster, 1805, in the appendix to which, will be found all the authorities cited on the trial.

" Public attention was thus called to the subject of contempts of court, and the mode of punishing them, and after several ineffectual attempts to have a legislative enactment on the subject, during the administration of the late Governor M'Kean, finally, after Governor Snyder was elected, on the 3d of April 1809, a law was enacted providing that ' the powers of the judges of the several courts of this commonwealth to issue attachments and inflict summary punishments for contempts of court, shall be restricted in the following cases, that is to say: To the official misconduct of the officers of such courts respectively—to the negligence or disobedience of officers, parties, jurors or witnesses against the lawful process of the court, to the misbehaviour of any person in the presence of the court obstructing the administration of justice.'

" The second section provided ' that publications out of court respecting the conduct of the judges, officers of the court, jurors, witnesses, parties, or any of them, if in and concerning any cause pending before any court of this commonwealth, shall not be construed a contempt of the said court, so as to render the author, printer, publisher, or either of them, liable to attachment and summary punishment for the same,' &c., but authorises a proceeding by indictment for the same, and gives the party aggrieved his action at law to recover damages for the injury sustained.

" The third section provided that ' the punishment of imprisonment, in the first instance, shall extend only to such contempts as are committed in open court, and all other contempts shall be punished by fine only: *Provided*, that the sheriff, or other proper officer, may take into custody, confine or commit to jail, any person fined for a contempt until such fine is discharged or paid, but if he shall be unable to pay such fine, such person may be committed to prison by the court for any time not exceeding three months.'

"The fourth section provided that, notwithstanding any thing contained in that act, the courts shall have power to make rules upon any sheriff or coroner for the return of any writ, for the payment of any money received on any execution or process, for the production of the body after a return of *cepi corpus* to an execution, or in default thereof for the payment of the debt and costs, and to compel obedience to said rules by attachment, and gave the

courts the same power against former sheriffs and coroners, where the complaint was made within one year after the termination of their offices.

" The act which was limited in its operation to three years after its passage, was made perpetual by the act of the 31st of March 1812. The fourth section was supplied and repealed by the act of the 18th of February 1822, 7 *Pamph. Laws* 496, which re-enacted the said fourth section almost in terms, but authorised the complaints to be preferred within two years after the expiration of the offices of sheriffs and coroners. These statutory provisions on the subject of contempts of court continued in force until the 16th of June 1836, when the bill reported by the commissioners appointed to revise the civil code, entitled " an act relative to the jurisdiction and power of the courts," was passed; *Purd.* 223; the 23d, 24th, 25th, 26th, 27th and 28th sections of which act are in the following words:

" ' Sec. 23. The powers of the several courts of this commonwealth to issue attachments and *to inflict summary punishments for contempts* of courts, shall be restricted to the following cases, to wit:

" ' I. To the official misconduct of the officers of such courts respectively.

" ' II. To disobedience or neglect by officers, parties, jurors or witnesses of or to the lawful process of the court.

" ' III. To the misbehaviour of any person in the presence of the court, thereby obstructing the administration of justice.

" ' Sec. 24. The punishment of imprisonment for contempt as aforesaid, shall extend only to such contempts as shall be committed in open court, and all other contempts shall be punished by fine only.

" ' Sec. 25. Provided that the court may order the sheriff or other proper officer to take into custody, and commit to jail, any person fined for a contempt, until such fine shall be paid or discharged; but if such person shall be unable to pay such fine, he may be committed to prison by the court for any time not exceeding three months.

" ' Sec. 26. No publication out of court respecting the conduct of the judges, officers of the court, jurors, witnesses, parties, or any of them, if in or concerning any cause depending in such court, shall be construed into a contempt of the said court, so as to render the author, printer, publisher, or either of them, liable to attachment and summary punishment for the same.

" ' Sec. 27. If any such publication shall improperly tend to bias the minds of the public, or of the court, the officers, jurors, witnesses, or any of them on a question depending before the court, it shall be lawful for any person who shall feel himself aggrieved thereby, to proceed against the author, printer and publisher thereof or either of them by indictment, or he may bring an action at law against them or either of them and recover such damages as a jury may think fit to award.

" ' Sec. 28. Provided that notwithstanding any thing hereinbefore

contained, the several courts aforesaid shall have power to make rules on sheriffs and coroners for the return of process in their hands, and for the payment of money, the delivery of any articles of value in their possession, according to their respective duties, and also to make rules upon attorneys for the payment of money and the delivery of deeds and other papers in their hands belonging to their clients, and in every such case to enforce obedience to such rules by attachment: and the courts shall have the same power against former sheriffs and coroners if application be made for the purpose within two years after the termination of their offices respectively.' It will be observed, that the object and effect of this last section is to subject the officers therein named, in the cases there stated to the operation of the summary proceeding, in its greatest severity and to except them out of the prohibition to imprison mentioned in the twenty-fourth section.

" These five sections it will be seen are compiled without any alteration in substance from the act of 1809, as amended by the act of 1822.

" These various legislative enactments made no alteration in the definition of the offence of contempt of court. The alterations relate exclusively to the mode of punishment, and constructive contempts are now punishable by fine and imprisonment after conviction on indictment therefor, instead of the summary process by attachment as at common law. The alteration is a judicious one, and has met the approbation of the public. It does away a power which, if arbitrarily exercised was calculated to infringe the liberty of the citizen, and unduly restrict the liberty of the press. A power which it is now generally conceded was oppressively exercised in Passmore's case, and hence taken away by the legislature from our courts. The offence, however, of contempt of court by publications improperly tending to bias the minds of the public or of the court, the officers, jurors or witnesses on a question depending before the court, is still of as deep a dye as ever, and the party on conviction thereof before a court and jury deserves, and should receive a punishment proportional to his guilt and malignity. But the case before the court is not one of a constructive contempt. It is for neglecting and refusing to obey the order and process of the court.

" The act of 14th of April 1834, entitled an act relative to the organisation of courts of justice, from section 79 to section 162, inclusive, *Purdon* 563 to 573, contains the provisions now in force, relative to selecting, drawing, summoning and returning jurors.

" Before the passage of the act of 20th March 1805, the process for selecting, summoning and returning jurors, was directed to the sheriff alone, who selected the persons and summoned them. Certain duties were imposed upon him by the statutes in force in Pennsylvania as well as by the act of 1789. But in 1805, the legislature,

to guard against abuses by sheriffs, enacted a law by which the county commissioners and sheriff were directed to make the selections conjointly, as directed by that act. Still there was no express authority given by the act, for the court to make orders upon or direct their process to the county commissioners. A precept usually issued signed by the judges for holding a court in pursuance of which, and often without it, the sheriff and commissioners drew jurors from the wheel. But the selection of the jury for the service of the year, was not made under any order of court, and the *venire facias* for summoning the jurors, drawn in pursuance of the precept, was directed to the sheriff alone.

" In 1834, the system was revised by the commissioners before mentioned, and the bill reported by them, with a few slight and almost immaterial alterations became a law on the 14th of April 1834. The 85th to the 90th sections of that act may be referred to as directing the time and place and manner of making the general selections of jurors for each year, as well as the manner in which that duty shall be performed and the jury wheel secured. Sections 91 to 95 inclusive, give the power to the court under various circumstances to make orders in regard to selecting jurors and filling the jury wheel. Section 93 contains the provision under which the order of court of the 26th of August last was made:—" When the array of jurors returned at any court shall be quashed by reason of any fault or irregularity in the selection of persons, or depositing their names in the wheel, as aforesaid, *the sheriff and commissioners of the respective counties shall upon the order of such court*, forthwith take out of the wheel, from which such jurors were drawn, all the names therein deposited and make a new selection of persons and deposite their names in the wheel for the remainder of the current year in the manner aforesaid."

" Sections 96, 97, 98, 108, 109, 110, 111, 112, expressly direct that the processes or writs of *venire facias* for drawing, summoning and returning the jurors required in the several courts, shall be directed to the sheriff and commissioners of the proper county, and give the forms of the process to be used, thus making a different provision from any theretofore in force, and in their report submitted with the bill to the legislature, the commissioners assign the following as their reasons for making the alterations in these particulars:—' We propose a form for the writ of *venire*. We have endeavored to adopt it to the substance of the acts of assembly. The writ should be directed to all persons whose agency is required in its execution. If the commissioners should refuse to aid in the drawing of the panel, the sheriff could not lawfully " cause a jury to come," &c., according to the commands of the writ in the ancient form. The effect of directing it to the commissioners as well as the sheriff, will be to make them answerable to the court for a contempt of the process in like manner as the sheriff would be.' See *Parke and Johnson's Digest* 800, note to sect. 112.

" The question is thus conclusively settled that in relation to the selection of jurors as directed by this order of court, as well as in drawing them from the wheel, the commissioners are officers of this court, and of consequence are bound to obey the order, direction and process of this court in the premises, on pain of being summarily punishable by attachment for contempt, 'for official misconduct or for disobedience or neglect of or to the lawful process of the court.'

" The remaining question then remains to be considered. Have the respondents been guilty of a contempt of court by official misconduct or by disobeying or neglecting the lawful process of the court.

" In many matters there is a discrepancy between the testimony of sheriff Cochran and Col. Whitley, the witnesses examined on the part of the commonwealth, and Mr. Peffer, the witness examined on the part of the respondents. Nay, in several important particulars, there are flat contradictions. Adopting the ordinary rule, supposing all there to stand equally well in point of respectability, the testimony of the two witnesses ought to prevail over that of one, and the court feel themselves, on this ground, fully justified in giving credence to the representation of facts made by those two gentlemen in preference to that of Mr Peffer. But in the intrinsic character of their evidence, this view of the testimony is greatly strengthened. The lists of persons which sheriff Cochran was making out to submit for consideration as jurors, contain the names of men of all political parties, and furnish a strong negative to the allegation of Mr Peffer, that the sheriff and Col. Whitley proposed selecting alone from their own party, and the entire partisan character of the minutes made by Mr Peffer show how deeply his feelings were enlisted in the business, independent of the positive declarations of the other two witnesses that many matters contained therein are positively untrue. We cannot therefore, rely on any thing contained in those minutes, which has not other evidence to support it.

"It appears to the court then, from the evidence before us, that sheriff Cochran, on the 23d and 24th of September last, at the meeting of the sheriff and commissioners, as before stated, proposed that the officers there assembled should select from the list of taxables in the several townships, the names of four hundred and forty-two persons, which it was agreed upon all hands was the number to be selected for the residue of the year, and deposit the names in the wheel agreeably to the order of the court. That Col. Whitley concurred in this proposition, and that Mr Hummel and Mr Bishoff refused to do so.

"It also appears that Mr Hummel proposed in substance to select from such lists of taxables the names of all persons whom they thought competent for jurors in the several townships, to fix the rate to which each township would be entitled of the number two

hundred and twenty-four required, and to put the names selected into the wheel and draw out by lottery the surplus above the ratio, to which such township would be entitled and to constitute the number required to be fairly deposited in the wheel of the remainders thus left.

"That Mr Bishoff concurred with him in this proposition, and that they declared they would agree to select in this manner and no other. That after voting against the proposition submitted by sheriff Cochran, and thus defeating it, they had the vote taken on this proposition of Mr Hummel's, which was defeated by sheriff Cochran and Col. Whitley voting against it, and that then, without any adjournment or motion to that effect, they broke up the conference by going away, and thus prevented any selection from being made for the residue of the year under the order of court, as well as any drawing of a jury under the *venire* for the adjourned court on the 14th of October.

" The proposition submitted by Sheriff Cochran, as sworn to by himself and Col. Whitley, was the proper and legal course of proceeding; it was in accordance with the decision of this court pronounced on the 26th of August last, in the presence of the sheriff and commissioners, and filed of record. Whilst the proposition submitted by Mr Hummel was decidedly contrary to law, and so pronounced by this court in the same opinion. Yet they pertinaciously adhered to this opposition to law and the express decision of the court, and the public have reaped the fruits of this perverseness in the loss by the suitors in the causes on the trial list, at the adjourned court, of the opportunity of trying their causes, and in the quashing the array of grand and petit jurors at the present sessions and term. For after the said adjourned court, and after the rule to show cause why the attachment should not issue against them, Mr Hummel and Mr Bishoff, with the new commissioner Mr Orth, elected in the place of Col. Whitley, overruled the sheriff and adopting the plan proposed by Mr Hummel as before stated, proceeded to select the names of persons, and deposited them in the wheel, in a manner not warranted by law. The consequence was, that on the first day of the present session, twenty-two grand jurors, and the persons attending on a panel of forty-eight petit jurors, were discharged and sent home, and the jury summoned for the next week, thirty-six in number, have been notified not to attend. The county has been subjected to the expense of summoning all these jurors, and of paying such as have attended or may attend, the criminal business of the county has been delayed, persons accused of crime have been discharged, and the suitors in causes on the trial list in the common pleas have again been deprived of the chance of trying their causes.

"The court, without going into any further examination of the evidence in regard to the conversations which passed during the two days the sheriff and commissioners were together, are satisfied that

[Case of Hummel and Bishoff.]'

Mr Hummel and Mr Bishoff have in the premises, been guilty of official misconduct, and have neglected, as well as disobeyed, the lawful process of this court, and that they are answerable for the contempt of which they have been guilty, in a summary manner, by attachment.

" This is, perhaps, the first instance in which, the question has arisen under the act. The court have taken time to advise upon the whole subject, and examine it in all its bearings and aspects, and having established the right and jurisdiction of the court, as well as the responsibility of the respondents, make the rule absolute, and award the attachment against them, leaving the imposition of the punishment on their being brought before the court, in some measure to be regulated by the temper and disposition which shall be evinced by the respondents to submit to the laws."

On the 3d of December 1839, the respondents appeared, and the court ordered the said David Hummel and John Bishoff, severally, to pay a fine of twenty-five dollars to the commonwealth, for the use of the county of Dauphin, and stand committed in case of non-payment, according to law.

Errors assigned:

1. The court erred in entering the rule to show cause why an attachment should not issue against commissioners Bishoff and Hummel, because the court had no jurisdiction or authority to make any such rule on them; the remedy for any neglect of, or refusal to perform, any duty enjoined upon them by law, being by indictment in the court of quarter sessions of the proper county.

2. The court erred in making the rule absolute and in awarding the attachment, because the facts which were the foundation of the contempt suggested, were not established by the testimony of disinterested witnesses, the only witnesses called to establish them being William Cochran, sheriff, and Michael Whitley, a commissioner, who, by the answer of the commissioners, verified by their affidavit and the minutes of the board of commissioners, verified by the oath of the clerk of the commissioners appended thereto, and made part of their answer, were charged as being the sole cause why the order of court was not fully complied with.

3. The court erred in making the rule absolute and in awarding the attachment, because the commissioners, by their answer to the rule under oath, declared that they " were desirous of complying fully with the said order, (of court,) by making a new selection (of jurors) in the manner directed by the act of the 14th of April 1834," &c., and " entirely disclaim the commission of any act of contempt to the court in the premises," thereby purging themselves of any intentional disobedience of the order of the court, or of any contempt whatsoever in the premises.

4. The court erred in adjudging the commissioners guilty of a contempt, and imposing a fine upon them, because after the rule was made absolute and the attachment awarded, the commissioners

IX.—2 M

[Case of Hummel and Bishoff.]

appeared in court, (no process having issued, being merely sent for by the court,) and without interrogatories having been filed against them, or any opportunity afforded them of purging themselves of the alleged contempt, the court decreed that they had been guilty of a contempt of court, and ordered them severally to pay a fine of twenty-five dollars to the commonwealth, for the use of the county of Dauphin, and to stand committed in case of non-payment according to law.

5. The court erred in adjudging the commissioners guilty of a contempt of court, and in inflicting the fine upon them before filing interrogatories, and ascertaining by their answers to them, that if, in their action with reference to the selection of jurors, they erred or acted illegally, such action was wilful and manifest to themselves, or whether it arose from a conscientious belief that in thus acting they were fairly and legally discharging the duties enjoined upon them by the act of assembly and the oaths they had taken.

*J. A. Fisher*, for plaintiff in error.
*Johnson*, attorney-general, for defendants in error.

The opinion of the court was delivered by

Sergeant, J.—The act of 16th of June 1836, relating to the jurisdiction and powers of courts, makes no change in the jurisdiction of the supreme court, so far as respects its superintendance over the proceedings of inferior courts. It expressly gives the court power to hear and determine all and all manner of pleas, plaints and causes which shall be brought or removed there from any other court of the commonwealth, by virtue of any writ or process issued from it, or any judge thereof, for that purpose *in the manner now practised and allowed*, to examine and correct all and all manner of errors of the justices, magistrates and courts of this commonwealth, in the process, proceedings, judgments and decrees, as well in criminal as in civil pleas and proceedings; and, thereupon, to reverse, modify, or affirm such judgments, &c., as the law doth or shall direct; and generally to minister justice to all persons, in all matters whatsoever, as fully and amply to all intents and purposes *as the said court has heretofore had power to do.* The previous power of the supreme court, under the act of 1722, is carefully traced by Gibson, C. J., in delivering the opinion of the court in The Commonwealth *v.* Beamont, 4 *Rawle* 366, where the provisions of that act are recited at length, and the practice under it stated, showing that it exercised a general superintending jurisdiction over the proceedings of inferior tribunals, whether proceeding by the course of the common law, or where they are summary or not before a court of record. In that case it was held that the judgment of the court of common pleas, quashing an inquisition in the case of lunacy, was reversible by the court, notwithstanding the subject of persons *non compotes mentis* is, by the constitution,

[Case of Hummel and Bishoff.]

committed concurrently to the supreme court, and to the court of common pleas. On the same principles, in Haggerty's case, this court determined that the proceedings of the court of common pleas, on a petition for leave to prove a contract for the sale of land by a decedent, may be removed to this court and examined into, on a *certiorari.*

If this be so in civil proceedings, there is still stronger reason why the proceedings by an inferior tribunal, for a contempt of court, should be subject to the revisory power of this court, to see that they have not overstepped their jurisdiction, and exercised this summary power in a case not warranted by the laws. For this is always ranked as a criminal proceeding, and the general common law rule is, that a *certiorari* lies from the king's bench to remove all criminal proceedings of an inferior court, unless there be a special exemption, or unless where, after conviction, the party is put to his writ of error. 2 *Hawk. P. C.* 406, 408. The object of the removal is not to inquire into the merits of the case, but to ascertain whether the court had jurisdiction, and exercised it according to law.

We are, therefore, of opinion that this court possesses a superintending jurisdiction. Whether this revisory power is properly exercisable by a writ of error was not made a question in this case by the defendants in error. If it had been, I should have thought a *certiorari* the appropriate mode of bringing the matter before this court. This, however, does not affect the merits of the case, but merely the form of removal, and was, therefore, probably not deemed material.

The second and most material question is, whether the county commissioners were officers within the meaning of the act of 16th of June 1836, restricting the powers of the several courts of this commonwealth to issue attachments and to inflict summary punishments for contempts of court, (among other things,) to the disobedience or neglect by *officers,* parties, jurors or witnesses, of or to the lawful process of the court. If they were, then the court had jurisdiction to inquire and determine whether they had been guilty of disobedience to their process, for the selecting and drawing of jurors, and had a right to inflict punishment for contempt, if, on such hearing, they convicted them of the fact; and, in relation to this, there is no appeal to this court, but it must rest with the sound discretion of the court itself. This question turns on the consruction of the act of 16th of June 1836, and, in our opinion, the county commissioners were clearly officers within the meaning of the act, as much so, in relation to the execution of the process of the court, as the sheriff or coroner to whom a writ is directed. These and other officers are the limbs and members without which the court could not discharge its functions, and their disobedience or neglect of its legal orders would arrest the course of justice, and produce infinite inconvenience to the community. They are chosen by the

[Case of Hummel and Bishoff.]

people to execute this duty among others—they undertake to perform it by accepting the office, and become thereby public officers, as such amenable like other officers to the court for the punctual discharge of their duty. Besides the indispensable necessity which every court is under to cause immediate obedience by the officers connected with it to its lawful process, there is a peculiar incongruity in contending, that the officers who refuse or neglect to draw juries should be punished by indictment, which can only be tried by jury. I fully concur in the principles and reasons stated by the court below, and am of opinion that they had power to punish the defendants by attachment for contempt, if they adjudged them guilty of neglect or disobedience to their process ordering them to select and draw jurors according to law.

The third objection regards the manner of proceeding, which, it is alleged, was irregular, because there were no interrogatories administered to the defendants after the attachment issued. Interrogatories are often required and generally used, but it seems not always. The law on this head is thus laid down in 4 *Black. Com.* 285, and seems supported by other books. "If the contempt be of such a nature, that, when the fact is once acknowledged, the court can receive no farther information by interrogatories than it is already possessed of, (as in the case of a rescue,) the defendant may be admitted to make such simple acknowledgment and receive his judgment without answering to any interrogatories." And in Rex *v.* Horsley, 5 *T. R.* 362, the prosecutor waived putting interrogatories to the defendant brought up on attachment for a rescue, and she acknowledging the facts, the court passed judgment on her. Here the defendants came in and put in their answers and defence on oath, stating all the facts and circumstances on which they relied, and also exhibited evidence, and, on a full hearing of these, the court adjudged them in contempt. They had all the benefit, therefore, which they would have had on interrogatories, and desired no more. The court then ought to proceed unless the prosecutor required interrogatories to be administered. This he did not do, probably believing no new circumstances would be elicited by them.

Judgment affirmed.