# Scranton City *v.* Peoples Coal Co., Appellant.

*Contempt—Money judgment—Act of May 19, 1897, P. L. 67—Bond—Appeals.*

1. Under section 15 of the Act of May 19, 1897, P. L. 67, where, in contempt proceedings, a money judgment has been entered against a private corporation, an appeal therefrom will be quashed unless bail is entered in double the amount of the judgment and all costs accrued and likely to accrue.

2. In contempt proceedings, the supervisory power of the appellate courts is limited to determining whether the court below has transcended its jurisdiction, and whether each essential fact, the finding of which was excepted to and is assigned for error, has any substantial evidence to support it, or can be fairly deduced from other proved facts.

*Equity—Injunction—Contempt.*

3. The parties affected by an injunction cannot escape all punishment upon the ground that it is uncertain in scope or meaning; this is a matter for the consideration of the court below in determining the extent and character of the punishment, and cannot generally be the basis of an appeal.

4. A decree should be interpreted in the light of the purpose intended to be accomplished by it.

*Constitutional law—Excessive bail—Contempt proceedings.*

5. Article I, section 13, of the Constitution of this State, which provides that "excessive bail shall not be required, nor excessive fines imposed, nor cruel punishment inflicted," relates only to criminal proceedings; but the principles embodied therein are applicable in all suits, civil as well as criminal.

*Attachment—Contempt.*

6. An attachment partakes of the nature of a civil remedy to enforce obedience to a decree of the court, and not merely to punish for a contempt.

*Corporation—Officers in contempt—Municipalities—Contempt—Order of court—Service—Notice—Punitive order—Order to make good.*

7. An order in a contempt proceeding is not punitive in its nature, and hence is not excessive, where it only requires the party, against whom it is made, to make good the expense which the other will necessarily have to incur because of the violation of the injunction.

8. The officers of a corporation will be held liable for contempt, if they knowingly breach an injunction decree against the corporation.

9. Where the parties against whom the proceedings for contempt are taken had actual notice of the scope of a decree of the court, they may be punished though the injunction was not formally served upon them.

10. A municipality will not be deprived of its right to punish one who has violated a decree in its favor, merely by reason of the fact that its mayor has endeavored to enforce a right given by the decree without applying to the court for assistance, and this is particularly so where all the matters, of which complaint is made, occurred prior to the action taken by the mayor.

11. A municipality, as the state's agent in charge of her streets, can enforce an injunction in regard thereto, although its mayor erred in the course he pursued in relation to the matter.

12. Not determined whether the officers of a corporation may be held liable for contempt if they fail to exercise due diligence to prevent the subordinate employees from violating a decree of the court.

Argued January 19, 1922.   Appeals, Nos. 165, 166, 167 and 168, Jan. T., 1922, by Peoples Gas Co., John G. Hayes, Frank P. Christian and James Pearn, from order of C. P. Lackawanna Co., Oct. T., 1916, No. 14, in contempt, in case of City of Scranton v. Peoples Coal Co. Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON and SCHAFFER, JJ.   Affirmed.

Petition for attachment for contempt of court.   Before MAXEY, J.

The opinion of the Supreme Court states the facts.

Order adjudging respondents in contempt.

Peoples Gas Co., John G. Hayes, Frank P. Christian and James Pearn took separate appeals.

*Error assigned,* inter alia, was order, quoting it.


*M. J. Martin* and *John P. Kelly,* with them *C. P. O'Malley, David J. Reedy* and *Ralph W. Rymer,* for appellants.—The decree must be shown to be clear and not ambiguous in its meaning before conviction of contempt for its violation: Smith v. Hickman, 14 Pa. Superior Ct. 46; Scranton Gas & Water Co. v. Iron & Coal Co., 167 Pa. 136.

The court erred in its interpretation of the two injunctions: Sullivan v. Steel Co., 222 Pa. 72; Collins v. Iron Works, 227 Pa. 326; Pennsylvania Coal Co. v. Sanderson, 113 Pa. 126.

In order to charge respondents with alleged violations, the evidence must be clear and positive: Sullivan v. Steel Co., 222 Pa. 72.

The alleged wrongful acts were done with the approval and knowledge of complainant's engineers.

Complainant here does not seek the aid of equity with clean hands: Power's App., 125 Pa. 175; Hay's Est., 159 Pa. 383; Englander v. Apfelbaum, 56 Pa. Superior Ct. 145; Sweeney v. Wilkes-Barre, 62 Pa. Superior Ct. 54; Dempster v. Baxmyer, 231 Pa. 28; McVey v. Brendel, 144 Pa. 235.

The fines and penalties are excessive.

The individuals in this case were not served with the decrees: Silliman v. Whitmer, 173 Pa. 401.


*Philip V. Mattes, H. C. Reynolds* and *Clarence Balentine,* for appellee.


OPINION BY MR. JUSTICE SIMPSON, March 27, 1922:

The City of Scranton, which is statutorily charged with the duty of keeping the streets of the municipality reasonably safe for public travel, filed a bill in equity against the Peoples Coal Company, alleging that to permit any more coal to be mined from under certain of those streets would result in a sinking of the surface, en-

dangering life and property, and subjecting the city to a very heavy expense. The case was so proceeded with that a preliminary injunction was granted as follows:

"Pending final disposition of the case, except as hereinafter stated, special injunction is awarded restraining and enjoining defendant and all persons acting by or under its authority, as follows:

"First: From all and singular any mining under the streets and other highways mentioned in the bill;

"Second: From mining or removing from the two socalled surface veins more than sixty per centum of the coal within the distance of one hundred feet of the center line of either of the streets or avenues mentioned in the bill;

"Third: From mining or removing from said surface veins more than the like proportion of sixty per centum of the coal within the distance of fifty feet from the center line of all highways, other than the streets and avenues, to wit, the courts, alleys, etc., involved in the bill;

"Fourth: The mining, where so limited to 60%, to be done as nearly as may be by chambers driven on 40 foot centers so as to leave pillars columnized not only as between these two veins, but also with reference to those in the underlying veins wherever that is possible;

"Fifth: Plaintiff, by its proper officers, to have the right of access to the mines at all reasonable times for purpose of inspection;

"Sixth: Main avenue is excepted from the operation of this order because of former adjudication in No. 1, March Term, 1915, between the same parties in this court."

A final decree was later entered by agreement, in substantially the same language, the following immaterial changes being made, however: the preliminary recital was omitted, the first paragraph was changed to name the particular highways to which the injunction applied, and a clause was added awarding a sum of money for the "damages occasioned by mine subsidences, which have

been repaired by the city to this date." The decrees were duly served upon defendant company, and, within a few days, copies thereof were admittedly received by Frank P. Christian, one of appellants, who was and is its treasurer, president and chief executive officer; another by the appellant, John G. Hayes, who was and is its general manager and consulting engineer; and, though the third individual appellant, James Pearn, who was and is superintendent and engineer of the company, denies he received a copy of the decree, he admits he knew its terms so far as respects the matters involved in this proceeding.

Subsequently a petition was filed by the city, averring that the company, acting through these appellants (and certain other employees and officials, who were later exonerated from liability by the court below), had violated the decrees in thirty-two specified particulars; answers were filed, testimony taken, and definite findings of fact were made, by which the company, and Christian, Hayes and Pearn were held to have been guilty of contempt of court in twenty-three of the specifications. It was also found, indeed was not denied by evidence, that to give to the streets the same support they had before the decrees were violated, would require that concrete pillars should be placed at the points where the coal had been wrongfully removed; that the cost of doing this would be the sum of $233,725.07, which, with a fine of $1,000 for breach of the paragraph of the decrees authorizing plaintiff to inspect the mine, and $15,917.44 expended in proving the violations alleged, aggregated the sum of $250,642.51, which the court below decreed appellants should pay to the city. From this order the four appeals now under consideration were taken.

A motion has been made to quash the appeal of the corporation, because it entered security in the sum of $5,000 only. Section 15 of the Act of May 19, 1897, P. L. 67, 70, provides that, "where a corporation, other than a county, township or municipal corporation, appeals on

its own behalf, such appeal shall be quashed unless bail is given to operate as a supersedeas as by this act required"; that is, as provided by section 6, which says that on appeals from judgments or decrees for the payment of money, if intended to operate as a supersedeas, security must be entered "in double the amount of said order, judgment or decree and all costs accrued and likely to accrue." Since this amount of security has not been entered, we must sustain the motion and quash the appeal.

In considering the other appeals, the first question to be determined is the extent of our jurisdiction in this class of cases. At common law there was no right of review whatever (9 Cyc. 61, 62); but we held in the Case of Hummell and Bishoff, 9 Watts 416, 431, and in Com. v. Newton, 1 Grant 453-4, that, "for the purpose of seeing that their jurisdiction has not been transcended, and that their proceedings, as they appear of record, have been according to law, we possess, and are bound to exercise, a supervisory power over the courts of the Commonwealth" in regard to contempt proceedings. This limited jurisdiction was greatly enlarged by the Act of April 18, 1919, P. L. 72, which provides that where the "order, sentence, decree or judgment" from which an appeal is taken, is founded on testimony, this shall be duly certified and filed, and "shall be reviewed by the appellate court, as a part of the record, with like effect as upon an appeal from a judgment entered upon the verdict of a jury in an action at law, and the appeal so taken shall not have the effect only of a certiorari to review the regularity of the proceedings in the court below." We held in Hand's Case, 266 Pa. 277, 281, that this act "does not require us to overrule findings which have evidence to support them," for the obvious reason that we would not do so "upon an appeal entered upon the verdict of a jury"; but we are required to determine whether each essential fact, the finding of which was excepted to and is assigned as error, had any substantial

evidence to support it, or could be fairly deduced from
other proved facts: Stahl v. Watson Coal Co., 268 Pa.
452.  This determines the extent to which we are re-
quired to go in the instant case, the jurisdiction of the
court below not being disputed.

The first of the objections made by the individual ap-
pellants is that the decrees, which they are alleged to
have violated, are so uncertain in scope and meaning as
to be unenforceable.  This is an ineffective plea of con-
fession and avoidance, however, for if the matters com-
plained of are not within the purview of those decrees,
it is of no consequence whether or not they are uncertain
in either scope or meaning, since no punishment can be
inflicted; if they are, then punishment may be imposed,
the extent thereof not being a matter which we can re-
view, unless some constitutional or statutory provision
is violated thereby, or perhaps if it is so excessive as to
shock the conscience.

Appellants assert, however, that because of the un-
certainty of the decrees they should not have been pun-
ished for contempt, especially as counsel for the com-
pany had advised the decrees did not forbid some or all
of the matters specified as violations thereof.  It is not
necessary to decide how many of the alleged violations
came within the scope of counsel's advice, since appel-
lants admit it cannot wholly excuse a contempt of court,
but can go no further than to appeal to the conscience of
the chancellor on the question of the extent and char-
acter of punishment; which, for the reason stated, is
not, ordinarily, reviewable by us.

We are of opinion, however, that the decrees are not
uncertain in scope or meaning.  Two objections are
urged which, rightly understood, resolve themselves into
but one.  It is claimed that the words "except as here-
inafter stated," in the preamble to the preliminary in-
junction, and the language of the second and third para-
graphs of both decrees, necessarily make it questionable
whether the first paragraph should not be limited to

other veins of coal than the "two so-called surface veins"; so that, as regards these latter veins, the coal company could remove sixty per cent of the coal from under the highways themselves, though this was wholly forbidden as to the other veins. The decrees, however, are clear and explicit in forbidding "all and singular *any* mining under the streets and highways," whether from the "two so-called surface veins" or any others; the second and third paragraphs providing an additional safeguard of lateral support for the highways (as we said in Scranton v. Peoples Coal Co., 256 Pa. 332, could be required, when necessary), by forbidding the taking of more than sixty per cent of the coal in an area of 100 feet from the centre line of the streets and avenues and 50 feet from the centre line of the other highways. Appellant Hayes admits,—and this must have been apparent to the other individual appellants also,—that a greater necessity existed for preventing excess mining in the surface veins than in those lower down, for thus only could full protection be given to the highways, and hence he thought it singular that more coal would be allowed to be taken from the former than from the latter. It follows that, as appellants knew the purpose intended to be accomplished by these decrees, this "singular" interpretation should have been rejected as incorrect, despite the advice of counsel, who may not have been adequately informed regarding the facts. Appellants should also have known that the effect of the percentage clause, in the second and third paragraphs, was simply to provide that if, at the time the decrees were entered, but little coal had been taken from the surface veins immediately under the highways (some coal having theretofore been removed under each of them), a greater quantity could be taken from the specified areas outside the lines of the highways; if much had been taken, less could subsequently be removed outside these lines; but thereafter none could be taken from under the highways themselves. It may be added, though perhaps unnecessarily, in view of the above con-

clusion, that the words "except as hereinafter stated,"
in the preliminary decree, refer to the sixth paragraph
where "Main Avenue is excepted from the operation of
this order," for reasons therein set forth.

Nor is the award of the $250,642.51 within the inhi-
bition of article I, section 13, of the Constitution of this
State, which provides that "Excessive bail shall not be
required nor excessive fines imposed, nor cruel punish-
ment inflicted," for this applies only to criminal proceed-
ings, whereas an "attachment......partakes of the
nature of a civil remedy to enforce obedience to the de-
cree, not merely to punish for the contempt": Tome's
App., 50 Pa. 285, 296; Com. ex rel. v. Lewis, 253 Pa.
175, 181; Patterson v. Wyoming Valley District Council,
31 Pa. Superior Ct. 112, 116.   The principle embodied
in the constitutional provision is, of course, applicable
in all proceedings, civil as well as criminal; but this
conclusion is of no help to appellants, since that cannot
be excessive which is not punitive.   If plaintiff and appel-
lants had entered into a contract which had for its pur-
pose the preservation of the status which existed at the
time those decrees were made, and the latter had breached
it by doing the things of which complaint is now made,
the cost of restoration would be the measure of plaintiff's
damage.   So also, under like circumstances, if appel-
lants wrongfully removed the coal and plaintiff was re-
quired to construct pillars to furnish adequate support
to the highways, the damages would be measured by the
expense thereof, with sufficient punitive damages added
to cover these costs.   A court would be weak indeed if a
wrongdoer could wilfully violate its decrees, and escape
with a less liability than if he had breached a contract
or committed a tort.

Appellants next urge that they were not served with
copies of the decrees, and hence cannot be attached for
contempt in violating them, though they enjoined "all
persons acting by and under its [the People's Coal Com-
pany's] authority," as well as the company itself.   As

already stated, two of these appellants admittedly received copies of the decrees, and the third knew of their terms, so far as relate to the matters under consideration; hence the question now to be decided is: Can they, knowing the decree enjoined them from doing the matters complained of, escape liability for their wrongdoing, simply because copies were not formally served upon them? Surely this question answers itself; if appellants had heard there was a decree against the company, but did not know its terms, their contention might be sustained; as it is, the court is not so impotent as to be unable to punish them if they acted in contempt of its mandate.

In Wilson v. United States, 221 U. S. 361, which was a proceeding against the president of a corporation for refusing to produce books required by a subpœna duces tecum issued against the company only, it is said, quoting from Commissioners of Leavenworth County v. Sellew, 99 U. S. 624: "As the corporation can only act through its agents, the courts will operate upon its agents through the corporation......Although the command is in form to the board, it may be enforced against those through whom alone it can be obeyed......While the board is proceeded against in its corporate capacity, the individual members are punished in their natural capacities for failure to do what the law requires of them as the representatives of the corporation." In Rapalje on Contempts, section 48, it is said: "Officers of a corporation who have personal knowledge that the corporation is enjoined, and, nevertheless, violate the injunction, are punishable." To the same effect is 1 Joyce on Injunctions, sections 257, 275a; 13 C. J. 40, 41. If this were not so, since a corporation can be punished by fine only, innocent stockholders would be compelled to pay the penalty, and the officers, unless they were stockholders also, would escape altogether, although the actual contempt was theirs. Hence it has been held that such liability exists where they had "actual notice......though

neither the injunction nor subpœna had been served upon them" (Rapalje on Contempts, section 45) ; and this for the reason that the law does not permit one, who knowingly acts in contempt of its decrees, to escape liability on a technicality.

In answering the petition for an attachment the furthest the individual appellants were willing to go, was to aver "on information and belief no violations of the decrees have occurred since April 23, 1919," and they had "never wilfully, intentionally or knowingly, in any form, manner or way whatsoever, either directly or indirectly violated any of the provisions of the said decrees, and that they have never knowingly or intentionally been guilty, in any form or manner, either directly or indirectly, of any act of contempt of the said court or any decree or order of the said court." The first of these denials, based on information and belief only, is admittedly founded on the erroneous construction of the decrees hereinbefore referred to; and the others, which allege an absence of wilful and intentional wrongdoing, but do not deny an actual violation, are perhaps as far as they felt it wise to go in view of their acquaintance, through the petition, with the extent of the city's knowledge, and also of their own purpose to rest, as far as they could, on the advice of counsel. These tacit admissions of their actual, though, as they say, not wilful or intentional violations of the decrees, may have had great weight with the court below in reaching its conclusions, and hence must be so considered by us in determining whether or not these appellants were responsible for the violations found; the evidence bearing upon this question being now stated as briefly as it can be done.

It appears that, when a portion of the area, from which by the decrees no further coal could be mined, was so far wrongfully exhausted as to probably render it unwise or unsafe to proceed further, the roof of the mine, in at least four separate places, was blown down, thereby effectually preventing an examination of the workings,

except at a prohibitive expense.   While these areas were still being wrongfully worked, the officials of the company required a day's notice of the intention of the city's inspector to visit the mines (which occurred once in every five or six weeks after February 3, 1919), and then walls would be built preventing access to the places where the coal was being wrongfully removed, so camouflaged as to have the appearance of having been constructed long before, and falsely asserted to be for ventilating purposes or for the support of the roof.   There were fifteen such walls.   After the inspector had left the mine, on the conclusion of these numerous examinations, the walls would be pulled down as soon as it was desired to proceed with the prohibited mining, and thus the city's officials were completely deceived and the violations long continued.

By law and custom, books and maps are required to be kept to display the mine workings; if accurately done they show between what dates the coal in designated areas was removed and how much remained at each period.   In the present instance these books and maps were kept in the executive department, of which Christian was chief and where his and Hayes's office was located, and the maps were posted, from time to time, under the direction of Pearn.   Those which would have shown the workings in the areas where the roof was blown down to conceal the wrongful mining, could not be found, and of this fact no adequate explanation was made.   At times the survey of the advanced work was kept on loose memoranda, or posted on blueprints instead of on the regular maps, and were placed in the office safe.   On at least one occasion, after it became certain that these memoranda and blueprints would become valuable in showing what had been done, Pearn made certain postings therefrom on the maps, and then threw the original papers into a waste-paper basket, from which they appear to have been taken and burned; at least they were not produced (for the effect of this as evidence,

see McHugh v. McHugh, 186 Pa. 197, 201). In other instances the advanced workings, demonstrating the violations of the decrees, were found duly entered on the maps of the Delaware, Lackawanna & Western Railroad Company, the coal company's lessor, but not on those of the coal company, though the facts regarding these matters were, or should have been better known to defendant's officers and employees than to the railroad company's servants, since the former were constantly in the mine and the latter only occasionally. The books and papers referred to were always open to the inspection of these individual appellants, and presumably were examined by them, for not otherwise could they perform their duties as officials of the company. If they were so examined, then appellants knew that the actual condition of the mine did not appear, that the results of second mining were not shown and that such entries as were made were long delayed. It cannot be presumed that they would have consented to these breaches of duty unless they had a reason for thus doing; indeed it was their own duty to so supervise the mining, which was in their charge, as to assure the fact that the court's decrees were not violated, and a failure to do this possibly would be sufficient to charge them with contempt: Silliman v. Whitmer, 173 Pa. 401, 406.

When the city determined to make a real inspection of the mine, appellants requested the usual day's delay; perhaps this time was partially spent in a posting of the maps, as was stated would be done, but if so they were still left incorrect; it is highly probable the delay was utilized, as usual, to reërect walls which hid the wrongful mining. Appellants make the remarkable but suggestive statement regarding this, that they thought the city's engineers were to be guests of the coal company, and were only "to examine the live workings"; this would appear to have meant, as theretofore, those "workings" which appellants chose to leave open for inspection; hence no objection was made to the visit when the day's

delay was granted. When it was ascertained, however, that the engineers intended to take down one of the walls which hid the wrongful mining, Pearn and several others stood guard with sprags and refused to allow it to be done; and when the engineers still proposed to proceed, a body of armed miners appeared on the scene and the engineers were compelled to withdraw. Later, when the engineers and mayor reappeared, and it thus became known that the city would insist on a thorough inspection, Christian, though now professing innocence, personally refused to give them permission to enter the mine (though this was expressly authorized by the decrees), and gave orders to the employees to prevent it. This the latter attempted to do by disabling the machinery, and the entrance was finally effected through an adjoining mine. When the camouflaged walls were removed, though it was asserted no one had been behind them for a long time, the recent workings were made clear, newspapers but a few days old and a drill hole, loaded with dynamite but unexploded, were found there, and the places were in such a condition as to show an intention to resume the wrongful mining as soon as it could be done with safety.

The evidence thus outlined so clearly indicates an intentional, concerted and continuous effort to violate the decrees, shown especially by the persistent efforts to conceal the wrongdoing, in which, of course, the subordinate employees who performed the manual labor of concealment could have had no personal or financial interest, that the only question is: Who are the real culprits? Recognizing this, Christian, in an endeavor to exculpate himself, points to certain other testimony which shows that, immediately after the decrees were made, he directed that they be obeyed, that he was sick at his home for some two months during the time the alleged violations were taking place, and even when well and at the office, was rarely in the mine. We are not so much concerned, however, with where he was or what he at first

said, as with what he said and did before and at the time
of the violations. Judicial history is not wanting in in-
stances where the spoken word was negatived by a wink
or other derisive gesture, and where the man who di-
rected the wrong was back of the firing line, others being
put forward to.bear the brunt of the attack, if one should
be made. Indeed this is the usual situation in cases of
this kind; so common has it become that the courts, like
the individual citizen, naturally look below the surface
to see what is there attempted to be hidden, remember-
ing always "that actions speak louder than words, is
sound law as well as proverbial wisdom": Graham v.
Dempsey, 169 Pa. 460.

In solving the problem of individual responsibility, the
first inquiry naturally is: Who connected with this
company had a motive to do the wrong? Unhesitatingly
one's mind answers: Christian primarily, despite his
contention above referred to. He was president, treas-
urer and director during the entire time covered by this
controversy, and was receiving a salary for so acting and
also a royalty on much of the coal mined. How much
coal was left in the mine does not clearly appear, but it
is reasonably certain it would rapidly become exhausted
if that protected by the decree of the court was left un-
disturbed. It is also clear that the company had not been
a financial success; Christian said it "had no profits but
losses," by reason whereof he had become a creditor for
over $92,000, despite the high prices received for coal
during the period of time covered by these proceedings.
Apparently no other persons advanced any money to the
company. In addition, Christian's wife and her brother's
wife were the only stockholders of the company, Mrs.
Christian receiving her $50,000 par value of stock by
gift from her husband. He says no dividends were paid
on this stock; but in any event the combined force of the
facts stated shows that he had a strong motive to mine
and sell at this particular time as much coal as possible,

and that he and his family alone stood to gain financially by so doing.

It must be evident from the foregoing that there was not reversible error in the findings of the court below that Christian and Pearn were engaged in a deliberate intent to violate the decrees. As to Hayes the evidence is not so certain, but we cannot say there is an entire absence of clear and satisfactory proof thereof. He was general manager or general superintendent, and was getting $6,000 a year for half his time. True, he now denies he held these offices, and says he was only consulting engineer and assistant to the president, but since, in previous litigations, he swore he was general manager, at a time when he had no interest to deny the fact, he could hardly have expected the court below to accept his denial as true. As such officer he necessarily was often in the mine, not only when the wrongful mining was hidden by false walls and blown-down roof, but also when everything was open to his view, and he must have known that the decrees, a copy of which he had, were persistently being violated. On one occasion, when his attention was called to certain wrongful mining then going on, he said he would have it stopped, but did not; and in another instance he said mining could not be done at a particular place because of the "black damp," though he knew or should have known that it was going on at that point in violation of the decrees. When he should have spoken, if innocent, he was silent, and continued in the employ of the company and under the control of Christian; these facts, added to the other matters above referred to, debar us from asserting there was no evidence he was acting in conjunction with Christian and Pearn in the wrong being done.

The last inquiry on this phase of the case is: Was there substantial evidence to sustain the findings as to actual violations in each of the instances specified in the decree appealed from? This is a matter entirely aside from a determination as to who is responsible therefor; and on

it Hayes and Pearn argue that the weight of the evidence is against some of those findings, thereby confessing that there is some evidence of each; Christian does not argue it at all, contenting himself with saying that although he has assigned them as error, he only does so "out of an abundance of caution, lest he should be charged with accepting the findings of the court below as final." Hence we might decide, for the reason hereinbefore stated, that the matter is thus admitted to be beyond our appellate jurisdiction, as, aside from this, we do, because a review of the evidence shows there was testimony sustaining each finding and as to some no countervailing evidence whatever.

Finally, say appellants, assuming all the foregoing to be true, still we cannot be held liable in this proceeding, because the conduct of the mayor was such as to preclude plaintiff from obtaining the relief sought. The facts on this point may be briefly stated: The fifth paragraphs of the decrees provide that "Plaintiff by its proper officers [shall] have the right of access to the mines at all reasonable times for the purpose of inspection." After the mayor and engineers of the city had been refused access for the purpose of making the inspection, the former took forcible possession, and the investigation which followed resulted in a discovery of the facts above detailed. It would have been better had the mayor applied to the court, instead of proceeding by a strong hand; but since the discoveries serve to explain appellants' conduct in opposing the inspection, which was expressly authorized by the decrees of the court, perhaps to some this measurably justifies the course pursued. Even if there is no justification, however, the argument made upon the point under consideration is without merit. All the violations complained of were before the mayor took possession; to say then that the flouting of the court's decrees and reparation to the city for the wrong previously done, cannot equitably be granted because of his subsequent action, indicates a confusion of thought regarding the legal prin-

ciples involved. If the decrees had been obtained by unclean methods, and the unclean person was seeking relief, a reason would appear for the contention now made; but this is not claimed, and indeed would not be a defense in this proceeding, for the remedy in that event would be an application to open or vacate them. Hence the remedy sought being reparation for a wrong which was consummated before the time when the mayor proceeded in the manner complained of, equity would grant relief even though he was himself the litigant: Orne v. Kittanning Coal Co., 114 Pa. 172; Reynolds v. Boland, 202 Pa. 642, 648. A fortiori, the city, as the State's agent, charged with the duty of protecting the public against wilful invasion of the state's rights in her streets, cannot be affected by the act of the mayor, even if it be supposed he was in the wrong and personally would have been denied relief.

The appeal of the Peoples Coal Company is quashed, and on the appeals of John G. Hayes, Frank P. Christian and James Pearn, the decree is affirmed and the appeals are dismissed at the costs of the respective appellants.