DEPARTMENT OF HEALTH, STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. PETER ROSELLE, *ET AL.*, *ETC.*, DEFENDANTS-APPELLANTS.

Argued January 9, 1961—Decided March 20, 1961.

334

*Mr. Samuel A. Larner* argued the cause for defendants-appellants (*Messrs. Budd, Larner & Kent,* attorneys; *Mr. Samuel A. Larner,* of counsel).

*Mr. William L. Boyan,* Deputy Attorney General, argued the cause for plaintiff-respondent (*Mr. David D. Furman,* Attorney General of New Jersey, attorney; *Messrs. William L. Boyan and William D. Hill,* of counsel).

The opinion of the court was delivered by

WEINTRAUB, C. J. Plaintiff moved for an order holding defendants in contempt for failure to comply with a final judgment. That judgment, entered with defendants' consent,

had ordered them to "cease violating the New Jersey Air Pollution Control Code, as promulgated and adopted by the Air Pollution Control Commission" on premises which they operate as a refuse dump. The Code in turn provided that "No person shall cause, suffer, allow or permit open burning of refuse * * *." The charge revolved about the outbreak of fires, the origin of which was unknown. The trial court found plaintiff had not sustained its burden "to establish a willful and deliberate" act violative of the judgment and hence denied the motion. The Appellate Division found defendants "in civil contempt of the injunction" and reversed for further proceedings to which we will later refer. 61 *N. J. Super.* 363 (1960). We granted defendants' petition for certification. 33 *N. J.* 119 (1960).

## I.

Defendants contend the proceedings were for "criminal contempt" and hence there could be no appeal from the trial court's judgment in their favor. *Danes v. Smith,* 22 *N. J. Super.* 292 (*App. Div.* 1952). The argument runs that whether a contempt is "criminal" or "civil" depends upon the nature of the injunctive order, and that if the order *forbids* the doing of an act, a violation can be but criminal, whereas if the order *commands* the doing of an act, the contempt is "civil." For this distinction, defendants cite among other cases *Staley v. South Jersey Realty Co.,* 83 *N. J. Eq.* 300, 304 (*E. & A.* 1914) and *Gompers v. Buck's Stove & Range Co.,* 221 *U. S.* 418, 31 *S. Ct.* 492, 55 *L. Ed.* 797 (1911). Here the injunctive order was prohibitory, at least in its phrasing, and hence defendants say the alleged contempt can be but criminal.

No doubt language can be found to support a distinction based upon the character of the injunctive command, but the distinction is foreign to the sense of the subject. ■ The trouble in this area is semantic. As is so often the case, labels are the villains. Short-hand descriptions

invented for one purpose lead to thoughtless results else-where. The word "contempt" signifies a public offense. It refers to a contempt of *government;* there is no such thing as a contempt of a litigant. The expression "criminal con-tempt" is as redundant as "criminal crime," and to talk of "civil contempt" is to talk of "civil crime." We do not speak of "criminal manslaughter" and "civil manslaughter" to describe either the public and private wrongs or the public and private remedies. Rather we use "manslaughter" to describe the crime and the prosecution, and "wrongful death" to describe the private wrong and the civil action for a private recovery. Unhappily, with respect to contempt, the public remedy was denominated "criminal contempt" and the private remedy was called "civil contempt." The result has been confusion both as to substance and procedure, a con-fusion which stems from loose expression rather than the nature of the subject.

On the substantive side, the labels have invited confusion as to the ingredients of the public and private wrongs and as to whether those wrongs are mutually exclu-sive. The contempt, *i. e.,* the public wrong, consists of a defiance of governmental authority. In the case of injunc-tive orders, it is more than the doing of the forbidden act or the failure to do what is ordered. The act or omission must be accompanied by a *mens rea,* a willfulness, an in-difference to the court's command. The breach, if accom-panied by that state of mind, challenges the authority of government whether the order be mandatory or prohibitory. With respect to the private wrong, the state of mind is irrelevant. *McComb v. Jacksonville Paper Co.,* 336 *U. S.* 187, 69 *S. Ct.* 497, 93 *L. Ed.* 599 (1949) ; *Hilton v. Hilton,* 89 *N. J. Eq.* 472, 477 *(Ch.),* affirmed 90 *N. J. Eq.* 564 *(E. & A.* 1919) ; *Ashby v. Ashby,* 62 *N. J. Eq.* 618, 620 *(Ch.* 1901) ; *Thompson v. Pennsylvania R. R. Co.,* 48 *N. J. Eq.* 105, 108 *(Ch.* 1891), reversed on other grounds 49 *N. J. Eq.* 318, 319 *(E. & A.* 1892). If the litigant has been denied what is due him under the order, he has suffered

an injury for which he is entitled to supplemental relief. And his right to relief does not depend upon whether the order disobeyed is mandatory or prohibitory. The nature of the command may bear upon the nature of the supplemental redress but not upon the litigant's right to it. If the order is mandatory and the violator has the ability to perform, the court will ordinarily jail the offender until he complies. If the order is prohibitory, again the offender may be incarcerated until he undoes the violation if he has the ability to undo it. For example, if a barrier is erected in violation of an order prohibiting it, the defendant may be jailed until it is removed. In either situation, the court may withhold the coercive remedy if satisfied that the violation was innocent and compliance will forthwith ensue. But in any event, whether the order be mandatory or prohibitory and whether civil incarceration be appropriate or not, the injured litigant may be awarded damages to compensate for interim loss of the benefit of the order which was dishonored. *United States v. United Mine Workers,* 330 *U. S.* 258, 67 *S. Ct.* 677, 91 *L. Ed.* 884 (1947); *Lamb v. Cramer,* 285 *U. S.* 217, 221, 52 *S. Ct.* 315, 76 *L. Ed.* 715, 719–720 (1932); *Leman v. Krentler-Arnold Hinge Last Co.,* 284 *U. S.* 448, 52 *S. Ct.* 238, 76 *L. Ed.* 389 (1932); *National Drying Mach. Co. v. Ackoff,* 245 *F. 2d* 192 (3 *Cir.*), *certiorari* denied 355 *U. S.* 832, 78 *S. Ct.* 47, 2 *L. Ed. 2d* 44 (1957); *Ashby v. Ashby, supra* (62 *N. J. Eq.* 618); *City of Scranton v. People's Coal Co.,* 274 *Pa.* 63, 117 *A.* 673 (*Sup. Ct.* 1922); *cf. Mantell v. International Plastic Harmonica Corp.,* 138 *N. J. Eq.* 562, 578 (*Ch.* 1946), modified 141 *N. J. Eq.* 379, 394–395 (*E. & A.* 1947).

On the procedural side, confusion has been equally evident. If a man is alleged merely to be in "contempt" he may not know whether he is hailed to answer a criminal charge or to respond to a prayer for supplemental relief for the adversary party. Yet the object of the proceeding is of great moment, for if it is criminal, he is entitled to the safeguards accorded one charged with crime, except the

constitutional guarantees of the indictment and trial by jury, and even as to them we note in passing that a vigorous dissent in *Green v. United States,* 356 *U. S.* 165, 78 *S. Ct.* 632, 2 *L. Ed. 2d* 672 (1958), finds those rights are assured. See Comment, 57 *Mich. L. Rev.* 258 (1958). Further, if the proceeding is criminal, the judgment must be a finite sentence, whereas if the proceeding is civil, incarceration ends when the need for coercion ceases, *i. e.,* upon defendant's compliance with the order. Hence the defendant must be informed at once of the purpose of the proceeding. It will not do to find its nature from the terms of the resulting judgment. A defendant must be told where he is going; it is not enough to tell him where he has been. It would be contrary to our conception of fairness to permit a proceeding for "manslaughter" in which the defendant must surmise whether the purpose is to convict for crime or to award damages to the victim's next of kin.

That "contempt" signifies an offense against the State is evident from the history of the subject. In his treatment of public wrongs, Blackstone included "contempts against the king's palaces or courts of justice" as a species of offenses against the king and government. 4 *Blackstone, Commentaries* \*124. In *Gompers v. United States,* 233 *U. S.* 604, 610, 34 *S. Ct.* 693, 58 *L. Ed.* 1115, 1120 (1914), which involved a violation of an injunctive order, Mr. Justice Holmes said:

"It does not follow that contempts of the class under consideration are not crimes, or rather, in the language of the statute, offenses, because trial by jury as it has been gradually worked out and fought out has been thought not to extend to them as a matter of constitutional right. These contempts are infractions of the law, visited with punishment as such. If such acts are not criminal, we are in error as to the most fundamental characteristic of crimes as that word has been understood in English speech. So truly are they crimes that it seems to be proved that in the early law they were punished only by the usual criminal procedure, 3 Transactions of the Royal Historical Society, N. S. p. 147 (1885), and that, at least in England, it seems that they still may be and preferably are tried in that way. \* \* \*"

In *Staley, supra* (83 *N. J. Eq.,* at *p.* 305), the Court of Errors and Appeals quoted from the foregoing excerpt from *Gompers* and said (at *p.* 304) that "Criminal contempts, on the other hand, as the term implies, are offences against organized society which, although they may arise in the course of private litigation, are not a part thereof, but, like other criminal offences, raise an issue between the public and the accused." See also *In re Jibb,* 123 *N. J. Eq.* 251, 252 (*E. & A.* 1938); *State v. Zarafu,* 35 *N. J. Super.* 177, 182 (*App. Div.* 1955); *State v. Janiec,* 25 *N. J. Super.* 197, 200 (*App. Div.* 1953); *Zimmerman v. Zimmerman,* 12 *N. J. Super.* 61, 66 (*App. Div.* 1950); *In re Bozorth,* 38 *N. J. Super.* 184, 188 (*Ch. Div.* 1955).

*N. J. S.* 2A:10–1 deals with the power of the courts "to punish for contempt." The word "contempt" is there used correctly to identify the public offense. The statute has an interesting history. As Mr. Justice Holmes pointed out in *Gompers, supra,* there is no doubt that a contempt could be punished by the regular criminal process, and it remains so punishable as a common law crime under *N. J. S.* 2A:85–1. The historical issue revolved about the power of a court to punish a contempt (other than one in the actual presence of the court) in summary proceeding, *i. e.,* without indictment and trial by jury. In the early 1800's a spate of summary prosecutions for "out-of-door" contempts consisting of criticisms of courts precipitated impeachment proceedings against judges who claimed the power to deal summarily with their critics. The subject perhaps also involved the substantive question whether criticisms are offenses at all if they fall short of libel, but the procedural aspect seems to have been the center of the storm. The story is told in Frankfurter and Landis, "Power of Congress over Procedure in Criminal Contempts in 'Inferior' Federal Courts—A Study in Separation of Powers," 37 *Harv. L. Rev.* 1010, 1023 *et seq.* (1924). As there pointed out the controversy resulted in the adoption by Congress on March 2, 1831 of "An Act declaratory of the law concerning con-

tempts of court" (4 *Stat.* 487), and the adoption of similar statutes in a number of the states (*p.* 1027).

In our own State, it was almost a century later that the Legislature expressed its view. As in the case of the federal statute, it was a claim of power to deal summarily with "out-of-door" criticism of a court, see *Croasdale v. Court of Quarter Sessions,* 88 *N. J. L.* 506 (*Sup. Ct.* 1916); *In re Verdon,* 89 *N. J. L.* 16 (*Sup. Ct.* 1916), reversed on other grounds 90 *N. J. L.* 494 (*E. & A.* 1917), which led to legislation. The Legislature responded with *Chapter* 37 of the *Laws of* 1917, entitled "An Act concerning contempt of court and restricting and defining the jurisdiction of the courts of this State with respect thereto." The statement attached to the bill (*S.* 272; Feb. 20, 1917) asserted that the judge's power "to summarily summon before them persons criticizing their official acts and to fine or imprison such persons at will and without a jury trial" is "truth-stifling, despotic, and exceedingly dangerous to liberty." It stated the purpose "to prevent abuses of this power" and noted that the bill was "modelled after the Act of Congress of March 2, 1831" to which we have already referred. The essence of the 1917 act now appears in *N. J. S.* 2A:10–1 which we cited above and which reads:

"The power of any court of this state to punish for contempt shall not be construed to extend to any case except the:

a. Misbehavior of any person in the actual presence of the court;

b. Misbehavior of any officer of the court in his official transactions; and

c. Disobedience or resistance by any court officer, or by any party, juror, witness or any person whatsoever to any lawful writ, process, judgment, order, or command of the court.

Nothing contained in this section shall be deemed to affect the inherent jurisdiction of the superior court to punish for contempt."

Parenthetically we note the final paragraph was added in the revision of 1951, probably because the constitutionality of the 1917 statute had been questioned. See *In re Bowers,* 89 *N. J. Eq.* 307, 309 (*Ch.* 1918); *In re Caruba,* 139 *N. J. Eq.* 404, 426 (*Ch.* 1947), affirmed 140 *N. J. Eq.* 563

(*E. & A.* 1947), *certiorari* denied 335 *U. S.* 846, 69 *S. Ct.* 69, 93 *L. Ed.* 396 (1948). As an aside, we add that in today's ferment with respect to this subject these statutes are claimed by some to overstate the summary power.

The point of immediate interest is that the Legislature, in defining the public offense within the summary power, included "Disobedience or resistance * * * to any lawful writ, process, judgment, order, or command of the court." No distinction was drawn between a mandatory order and a prohibitory one, and for the plain reason that the defiance of constituted authority is equally evident whichever is the character of the command.

■ Our rules of court unfortunately refer to the "nature" of a contempt as "criminal or civil." But if it is clearly remembered that "criminal contempt" means a public prosecution for the offense and that "civil contempt" means only a private proceeding for supplemental relief on behalf of the litigant, the correct procedure readily appears.

■ To begin with, a prosecution for contempt can be initiated only by the court itself. The court may institute the prosecution on its own motion or may do so upon information supplied by a litigant. *Van Sweringen v. Van Sweringen,* 34 *N. J. Super.* 394, 402 (*App. Div.* 1955), reversed on other grounds 22 *N. J.* 440, 444 (1956). The litigant's role is to acquaint the court, rather than to level the charge. That the rules contemplate that the court, rather than the litigant, shall prefer the charge is evident from the language of *R. R.* 4:87–2:

"* * * In any cause in which the court determines that the contempt may be criminal in nature—

(a) The notice may be given orally by the judge in open court in the presence of the person charged with contempt or by an order of arrest, or * * * by an order to show cause."

To the same effect is *R. R.* 3:8–2(a).

■ There are important reasons why the decision must be the court's and only the court's. The contempt process is everywhere acknowledged to be harsh because of

its summary nature and the many roles the court plays in the proceeding. The power should be used sparingly. A litigant should not be permitted to invoke the criminal process as a thumbscrew to achieve a private result. A judge should be alert to this possible misuse and should guard against it in deciding whether and when a criminal prosecution should be instituted.

If a court decides to proceed with the criminal charge, it must by order designate an individual to prosecute the matter unless it concludes a prosecutor is unnecessary. The prosecutor may be "the Attorney General, the county prosecutor or any other attorney of this State." *R. R.* 4:87-2(c); *R. R.* 3:8-2(c). In its discretion, the court may so designate the attorney who represents the complaining litigant unless it senses that unfairness may ensue, and if so designated, the attorney represents the State and not his private client. *Whippany Paperboard Co. v. Local No.* 301, *United Paperworkers,* 11 *N. J.* 153, 163 (1952).

Hence it is clear that a prosecution for contempt may not be instituted upon the mere notice of motion by a litigant to the alleged offender. Except where the court has given oral notice in open court or by an order for arrest, the notice may be given only by an order to show cause. On the other hand, a litigant's application for supplemental relief in his own interest may be made by motion on notice to the opposing party. If a motion is used, there is no procedural ambiguity, but since the notice of the litigant's application may also be given by order to show cause, *R. R.* 4:87-2, confusion may arise unless the court gives clear notice in the order as to whether the respondent is directed to show cause (1) why he should not be adjudged guilty of and punished for contempt or (2) why the moving litigant should not receive supplemental relief because of an alleged violation of an order.

Although *R. R.* 4:87-3 provides that "upon the hearing of the charge for contempt * * * the court

shall determine whether the contempt was criminal or civil in nature, or both," the quoted language should not be understood to mean that the nature of the proceeding, *i. e.*, criminal or civil, shall first be ascertained at the conclusion of the hearing. Rather it means that if the order to show cause is not sufficiently informative, the respondent may seek an unequivocal statement of the purpose of the proceeding at the outset of the hearing. The better course is for the court to decide whether it intends a criminal prosecution at the time it signs the order to show cause. Indeed, unless the judge makes that decision at that stage, he cannot know whether to designate a prosecutor or whether, if he signed the order allegedly violated, to make the matter returnable before another judge as he must if the purpose is to punish, or to make it returnable before himself as he may and ordinarily will if the purpose is to furnish relief for the litigant. *R. R.* 4:87–2(e). Moreover when the purpose of the proceeding is first made clear at the hearing, a postponement may be required if the respondent is unable to prepare for want of adequate notice.

The portion of the rule quoted in the preceding paragraph appears to contemplate that the prosecution for the offense may be coupled with the litigant's quest for private relief. That course involves serious questions. See dissenting opinion of Mr. Justice Rutledge in *United States v. United Mine Workers,* 330 *U. S.* 258, 342, 67 *S. Ct.* 677, 91 *L. Ed.* 884, 938 (1947), and his concurring opinion in *Penfield Co. of Cal. v. SEC,* 330 *U. S.* 585, 595, 67 *S. Ct.* 918, 91 *L. Ed.* 1117, 1125 (1947), and see *Danes v. Smith, supra* (22 *N. J. Super.,* at *p.* 295). We need not now determine whether both charges may be combined or tried in a common hearing over a respondent's objection, but it is appropriate to note the grave doubts which would attend a double-barrelled proceeding.

With these views in mind, we come to the question whether the proceeding in the present case was to punish for contempt.

The matter was initiated by notice of motion, a mode unauthorized if the purpose is to prosecute criminally. The court did not designate a prosecutor, and hence counsel for the plaintiff could have appeared only as a representative of a litigant in a civil proceeding.

In the notice of motion plaintiff stated it would seek an order (1) "Holding the defendants in contempt for failure to comply with the Judgment"; (2) "That they cease the open burning of refuse and other matter" in violation of the Code; (3) "That the defendants be committed and held in close custody until the Judgment and Order of the Court are complied with"; and (4) "That the defendants be fined $50.00 payable to the State of New Jersey as provided by *N. J. S.* 2A:10–5."

The first prayer is equivocal in the light of past usage, since the expression "to hold in contempt" has been employed whether the proceeding was criminal or civil, but it is significant that there was no statement of a purpose to "punish." The second and third items plainly relate to further relief for plaintiff. The fourth item, which seeks a fine under *N. J. S.* 2A:10–5, also evidences the civil nature of the proceeding despite the usual connotation of "fine." An explanation is necessary to show that this is so.

*N. J. S.* 2A:10–5 provides that "where the contempt is primarily civil in nature" the court shall impose "a sum not exceeding $50 as a fine" for the use of "the state or the county, as the case may be." The quoted terminology reflects the confusion to which we have already referred, as does also the caption to the section, "Civil Contempt; Punishment." The historical note states the source of this section is *section 82, chapter 158, Laws of 1902, p. 538.* The 1902 act was a revision of the Chancery Act. *Section 82* opened with the phrase, "To enforce obedience to the process, rules and orders of the Court of Chancery," and after providing for the imposition of a fine not exceeding $50, it then directed that "the said person being in court, upon process of contempt or otherwise, shall stand com-

mitted and remain in close custody until the said process, rule or order shall be obeyed and performed, and until the fine so imposed for such contempt, with the costs, be fully paid." The quoted provisions quite plainly reveal that the proceeding in mind was a civil one for the relief of a litigant rather than a prosecution for contempt. In *Frank v. Herold,* 64 *N. J. Eq.* 371 (*E. & A.* 1901), appeal dismissed 191 *U. S.* 558, 24 *S. Ct.* 844, 48 *L. Ed.* 302 (1903), the court held that the identical provision in the earlier Chancery Act was intended to deal solely with the civil remedy and not to limit the court's power to punish for the public wrong. The section later appeared in *R. S.* 2 :15–7 and was still limited to the Court of Chancery. In the revision of 1951 the act was extended to the whole superior court and the county courts, and in lieu of the phraseology we quoted above, the proceeding was described as one "where the contempt is primarily civil in nature." Hence despite the usual penal connotation of "fine," *Lathrop v. Lathrop,* 57 *N. J. Super.* 532, 538 (*App. Div.* 1959), the word must here be understood to describe only an imposition in the nature of costs in favor of the State or the county to reimburse government for the pecuniary burden imposed by the breach of the order and the civil proceeding which that breach precipitated. It might be added that in this muddled area the word "fine" is also sometimes used in still another non-penal sense, to describe the compensatory damages awarded the litigant for violation of an order. In short, one must look through the label to discover what lies beneath it.

Hence we think there was nothing to support the claim that the proceeding here was criminal. All the indicia are the other way. The record nowhere suggests that defendants were misled or prejudiced, and if the phrasing of the judgment under review may be said to reveal what everyone understood throughout, we note it describes the motion as one for "civil contempt." We are satisfied that

such was the motion. The judgment was therefore appealable. *In re Richardson,* 31 *N. J.* 391, 395 (1960).

## II.

■ This brings us to the merits of the case. The Appellate Division correctly held that upon a litigant's application for enforcement of an injunctive order, relief should not be refused merely because the violation was not willful. It then concluded that defendants breached the mandate of the judgment that they "cease violating the New Jersey Air Pollution Control Code," but that since the mandate lacked specific directions, the trial court should have granted relief to plaintiff "by specifying the means to be used hereafter by defendants to bring themselves into compliance." With respect to the "fine" authorized by *N. J. S.* 2*A*:10–5, the Appellate Division said the trial court could reflect a finding of innocent failure "in the size or the denial of the requested fine."

■ We must disagree. It seems to us that the restraint was too vague to sustain a finding of a violation on the record before us, and that the specificity which the Appellate Division ordered should have been the attribute of the original judgment itself.

The Air Pollution Control Act (1954) (*L.* 1954, *c.* 212; *N. J. S. A.* 26:2C–1 *et seq.*) created the Air Pollution Commission within the State Department of Health. The Commission and the Department are given wide powers to meet the pressing dangers of air pollution. The Commission is authorized to adopt a code or rules and regulations "controlling and prohibiting air pollution," *N. J. S. A.* 26:2C–8. The Department is directed to "control air pollution in accordance with any code, rule or regulation promulgated by the commission," with power to "(e) Receive or initiate compliants * * * and institute legal proceedings for the prevention of air pollution and for the recovery of penalties, in accordance with this act." *N. J. S. A.* 26:2C–9.

The statute lays down the steps for enforcement of the code. If investigation reveals a violation, the Department shall "endeavor to eliminate any source or cause of air pollution resulting from such violation by conference, conciliation and persuasion." *N. J. S. A.* 26:2C–14. If such efforts fail, the Department shall serve a notice and complaint, *N. J. S. A.* 26:2C–15, which shall be tried administratively in the manner provided by *N. J. S. A.* 26:2C–16 and 17. If the hearing results in a finding of violation, the Department "shall fix a reasonable time during which said person shall be required to take *such measures as may be necessary to prevent the same* and to give periodic progress reports." (Emphasis added) *N. J. S. A.* 26:2C–18. Thus the statute directs the Department to determine in plain terms what shall be done. If necessary to that end, the order may, absent some constitutional limitation, wholly prohibit an offending business operation. If it appears that something less will do, it should be ordered, subject to the continuing authority to compel more or to ban the operation completely if lesser measures prove inadequate. The order must be made after hearing, and that order is directly reviewable under *N. J. S. A.* 26:2C–20 which reads:

"Review of any final decision or action by the department or by the commission shall be by procedure in lieu of prerogative writs. Review of the validity of any code, rule or regulation promulgated by the commission shall likewise be by procedure in lieu of prerogative writs."

Finally *N. J. S. A.* 26:2C–19 provides:

"If such preventive or corrective measures are not taken in accordance with the order of the department, the department may institute a civil action in any court of competent jurisdiction for injunctive relief to prevent any further violation of such code, rule or regulation. Said court shall have power to grant such injunctive relief upon notice and hearing. Any person thus determined by the department to have violated a code, rule or regulation promulgated by the commission shall be liable for a penalty of $100.00 per week beginning with the 10th day after the expiration of the time fixed for the taking of preventive or corrective measures in the

department's order. In the event that he continues to maintain or to permit the maintenance of any condition which has been determined by the department to constitute such a violation, the method of recovery of said penalty shall be pursuant to the Penalty Enforcement Law."

Before it adopted the Code, the Commission held a public hearing. The record indicates the likely causes of fires other than one purposely started by the dump operators are (1) fires so started by strangers; (2) the dumping of hot ashes and the like; and (3) spontaneous combustion. It was generally agreed there are two ideal approaches to the problem. One is the use of incinerators, which is the antithesis of open dumping, and the other is the "sanitary landfill" method whereby a layer of soil is spread over refuse and combustible materials as they are dumped. At the public hearing, some emphasized the large capital expenditures involved in the incinerator approach and the substantial costs which the sanitary landfill method would entail and which ultimately would be passed on to the municipalities or their citizens. Doubtless because of these considerations, the Code did not require either the incinerator or the sanitary landfill methods for refuse disposal. Plaintiff informs us that by virtue of action later taken under other legislation, the sanitary landfill method became mandatory for all dumps throughout the State on June 30, 1960, a fact which simply emphasizes that the Code did not take that step.

In short, therefore, the Commission deliberately omitted to require disposal by incinerators, thus permitting open dumping to continue, and also deliberately omitted to require sanitary landfill, thus permitting the continuance of dump operations in which the outbreak of fires was understood to be likely. Rather it provided in the Code that no person "shall cause, suffer, allow or permit open burning of refuse." The word "cause" is clear enough, and if defendants had set the fires in question, their violation of the injunction would be plain, and the vagueness of the words "suffer, allow or permit" would not relieve them of

responsibility. But plaintiff disavowed a charge that defendants started the fires and indeed disavowed knowledge of their origin.

What, then, is the meaning of "suffer, allow or permit"? At the argument before us plaintiff conceded that the mere outbreak of a fire would not *per se* constitute a violation, but seemingly argued that occurrence of a number of fires over a period of time somehow demonstrated a breach. We are not sure whether the breach is claimed to inhere in a failure to take available measures to prevent fires or to act more expeditiously to put them out. The motion was uninformative. So also was the evidence since plaintiff apparently thought it enough to prove the fires occurred. Plaintiff offered no testimony as to what defendant should have done beyond what they did either with respect to fire prevention or fire fighting.

The vagueness of "suffer, allow or permit," if unimplemented by specific direction, becomes striking when one ponders plaintiff's prayer that defendants "be committed and held in close custody until the Judgment and Order of the Court are complied with." In its brief, plaintiff says "It is true that the judgment does not direct defendants to take any single step to prevent the occurrence of open burning on the dump which they operate" and then observes that "this gives defendants more liberty and flexibility in choice of the means of purging themselves of contempt than they would have if a single specific act had been directed" and that "They had, not a single key to the prison in their own pocket, but many keys." Quite the contrary. How could an imprisoned defendant know what measures would suffice to liberate him? Plaintiff does not suggest what specific measures it deemed sufficient. Rather plaintiff seemingly contends a court should so determine when defendants are sent to jail. That would be quite late and unnecessarily so; the measures, whatever they are, should have been specified in the departmental order. A defendant enjoined in such terms faces the specter of a criminal prosecution.

True he may be acquitted if the uncertainty is found to dispel willfulness, but an acquittal is at best but some comfort. So also there is a fear of the possibility of a civil commitment terminable upon compliance with the uncertain. And liability for the statutory penalty should not depend upon a defendant's ability to guess what will be found to be a sufficient provision to prevent fires or to extinguish them. The Appellate Division recognized the absence of adequate criteria, for it directed further relief "by specifying the means to be used hereafter by defendants to bring themselves into compliance." The statute contemplates that such specifics shall appear in the departmental order.

It is disturbing that defendants consented to a final judgment they now question for vagueness. The initial reaction is to leave them with the burden they accepted. But reflection leads to another view. After all, as defendants they simply consented to a judgment in the very terms of the prayer for relief in the complaint. To them the order may well have meant they must employ reasonable methods to cope with the problem. Perhaps the restraining order should be so construed and defendants held to civil liability upon that standard because of their consent, but plaintiff did not seek to prove a violation upon that theme. Nor, in terms of future compliance, can a restraint of such lazy generality be a truly effective remedy in the public interest. As the litigation demonstrates, it merely delays a solution by inviting controversies over what was meant and the sufficiency of what was done. Plaintiff increases its own workload when it resorts to generalities since sooner or later they must be made concrete. Plaintiff should use its ample power to deal with the problem with decisive clarity.

We considered a remand to the trial court for retrial of the original complaint but to do so would be to require a court to make an initial determination which the Legislature confided to an administrative agency. Hence we think it better to have plaintiff start the administrative

hearing anew in accordance with the plan the Legislature prescribed.

The judgment of the Appellate Division is accordingly reversed and the judgment of the trial court is affirmed. No costs.

FRANCIS, J. (dissenting in part). I agree that the judgment of the Appellate Division should be reversed and that of the trial court affirmed.

The opinion of the Court, however, goes beyond the issues in the case and in *effect* revises R. R. 4:87-2 and 3 of the Rules of Civil Practice, which regulate the procedure in contempt matters. There is no denying that the practice requires clarification, but I am inclined to think that revision in such an important area might more advantageously await study by the Rules Committee and, perhaps, consideration at a Judicial Conference. Pursuit of that course will give us the benefit of the many practical experiences of the trial bench and bar with the operation of the rules in their present form, and may produce a more just and perdurable practice. Of course, this court may proceed at once by the opinion process, as it has done here, to make any changes that seem desirable. But in such instances we should be certain that the new regulation (arrived at by way of interpretation) represents the best and most expeditious avenue to justice in the area under consideration. Because in my view that goal is not reached by the court's opinion, I feel compelled to adhere to the existing interpretation of the pertinent rules which, in one particular at least, seem more responsive to the specific needs of the subject matter.

Generally, under the current practice when a court order is alleged to have been defied, an *ex parte* verified motion or petition seeking an order to show cause why the violator should not be adjudged in contempt is presented to the judge who issued the contemned order. The order to show cause when issued is made returnable before the judge who

signed it. On the return day, at the outset of the proceeding, the court hears counsel for the parties as to whether the disobedience charged should be prosecuted as criminal contempt or, as the Chief Justice rightly says, under the misleading label of "civil" contempt. If he concludes that the contempt should be treated as criminal, then a prosecutor is appointed and the matter is referred to another judge for plenary hearing. *R. R.* 4:87–2(*d*).

The important factor to be kept in mind in connection with the existing *modus operandi* is that except in rare instances on the return of the order to show cause the alleged offender has the opportunity to persuade the judge whose order was allegedly disobeyed, by way of argument (supported by affidavits, if he chooses), that the matter should not be charged or tried as a criminal affront to the dignity of the court. *R. R.* 4:87–3 imposes a mandate that a preliminary decision of that question shall be made. It says that "the court shall determine" etc., and its internal sense is that the determination shall be made in the presence of the parties involved. This valuable opportunity has grown up in the administration of the rule—as a matter of right, in my judgment, in view of the language used—and it ought not to be taken away by a new interpretation at this late date.

The construction now adopted for future application effectively removes the right to be heard on that important preliminary issue. The opinion gives the ear of the court to one party alone as to whether the alleged violator of the order should be charged with a criminal contempt. The plain import of the language used is that henceforth the question whether to prosecute criminally should be decided by the court before it signs the order to show cause. With extremely infrequent exceptions (as where, for example, the judge might read of the disobedience of his order in the newspaper, and act on his own motion) the litigant, for whose advantage the order was executed, would instigate the proceedings. Thus, from this day forward, such an

interested party will be allowed in *ex parte* fashion to seek and obtain through self-serving argument a decision that his adversary should be tried for criminal contempt and that the prestige of the court cannot be adequately vindicated by supplemental relief in aid of the allegedly contemned directive. As has been noted, the order to show cause in criminal contempt will be returnable before another judge. Obviously, the latter will proceed as directed and will regard the preliminary question as to whether the matter should be tried as a criminal infraction as having been settled by his colleague.

The departure from the existing practice authorized by the majority opinion is a substantial one. It violates the rule as my experience indicates it has been construed and administered. I agree that it would be more expedient to determine prior to issuance of the order to show cause whether the alleged transgression of the court's order should be prosecuted as a criminal contempt. But having in mind the awesome contempt power of the court, I believe that under *R. R.* 4:87–2 and 3 in their present form such a grave question must be settled only after notice to the alleged contemnor and not *ex parte*.

JACOBS, J., votes to reverse on the merits for the reasons expressed in Part II of the majority opinion.

FRANCIS, J., concurring in result.

*For reversal*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL and HANEMAN—6.

*For affirmance*—None.