THE CITY OF BRIDGETON, IN THE COUNTY OF CUMBERLAND, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. GLADYS JONES, JOHN DOE, JANE DOE (FICTITIOUS) AND OTHER UNNAMED DEFENDANTS, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted September 27, 1988—Decided October 26, 1988.

Before Judges PRESSLER, O'BRIEN and SCALERA.

*Richard M. Pescatore,* attorney for appellant (*Basile, Testa & Testa,* attorneys).

*Michael Brooke Fisher,* attorney for respondent (*Lummis, Fisher & Krell,* attorneys).

The opinion of the court was delivered by

PRESSLER, P.J.A.D.

Defendant Gladys Jones was adjudicated in contempt of court following proceedings conducted pursuant to *R.* 1:10–2 to –4. She was sentenced to the maximum term of six months in jail and appeals, claiming that the adjudication was attended by fatal procedural irregularities. We agree that the conduct of the contempt proceeding by the judge whose order was allegedly contemned rendered the adjudication void, and accordingly we vacate the judgment appealed from.

The proceedings below arose out of an action for possession brought by plaintiff City of Bridgeton against defendant Jones. Insofar as we are able to determine from this record, defendant had at one time owned various parcels of land in the city, most of which she lost through tax foreclosure. At the time of the proceedings here she was 65 years old, uneducated, barely literate, and employed seasonally from time to time shucking oysters or picking vegetables. Her primary income was her receipt of food stamps, social security payments, and supplemental social security benefits totalling $465 per month, and her sole assets were a 1972 automobile of nominal value and the vacant lot and trailers hereinafter described.

Defendant's original holdings on Colfax Avenue in the City of Bridgeton apparently consisted of lots designated 8, 9, 10, and 11, all apparently still vacant. The City acquired lots 8 and 9 by an *in rem* tax foreclosure judgment in 1984, and a Robert Weher, whose identity and place in the chain of title are not disclosed by the record before us, now owns lot 10. Defendant has apparently retained title to lot 11. At some unspecified time prior to the July 1987 commencement of the City's possession action, defendant acquired six trailers, mostly from junk yards at nominal cost, but one for which she paid $1,500. She placed two of them on lot 11 and four of them on the city-owned lots, 8 and 9. She then erected a fence of pallets around the entire four-lot parcel. It appears that she resided in one of the trailers and leased the others to tenants. Although she re-

quested rent in the amount of $200 a month, some tenants paid less and some nothing at all. The problem with this trailer arrangement was not only that defendant did not own the land on which four of the trailers were located but, moreover, she had never obtained a municipal permit for the trailers, all of which were, in any event, in substantial violation of sanitation, electrical and other municipal code requirements. We also gather from this record that defendant had not responded to previous efforts by city departments to enforce its applicable codes and that she had for some time been aware of the code and ordinance violations she was committing. The City's possession suit also demanded the additional relief of requiring the occupants of the trailers to vacate them immediately,[1] requiring defendant to remove the trailers on both her land and the City's within a reasonable time, and requiring her to remove the pallet fence.

On August 14, 1987, the return date of the order to show cause by which the action was commenced, final judgment was directed granting the relief demanded in the complaint. All occupants, including defendant, were ordered to vacate the trailers by September 18th. Defendant was ordered then to board up and secure the trailers and to disconnect them from utility services, and the City was authorized to dispose of the trailers if defendant did not do so by October 2, 1987. A conforming judgment was entered on August 26, 1987. Although we do not have a transcript of the proceedings which took place on the return of the order to show cause, the ensuing judgment recites that defendant was present in court with an attorney, and she does not now contend otherwise. The contempt adjudication which is before us on appeal is based on plaintiff's allegedly contumacious conduct following the August 26, 1987 order.

---

[1]These occupants had been joined as defendants in the litigation by John Doe designations.

Defendant apparently took few if any steps to comply fully with the August 26th order for several weeks following its entry, and on September 16, 1987, a municipal court complaint was filed, sworn to by the building inspector, charging defendant with the fourth degree crime of contempt pursuant to *N.J.S.A.* 2C:29–9 based on that noncompliance.[2] The trial judge who had entered the August 26th judgment entered an order dismissing the municipal court criminal complaint for the reason that "said alleged contempt should be treated as a civil contempt in violation of *R.* 1:10." He also in that order appointed the city solicitor to prosecute the matter before him.[3] An attorney was thereafter appointed at defendant's request to represent her.

At the ensuing contempt hearing on October 13, 1987, the evidence showed that at 9:00 a.m. on September 18, 1987, the date fixed by the August 26th order for vacation and boarding up of the trailers, five police officers and three Housing Authority inspectors went to the site to padlock the trailers. According to the testimony of one of the officers, defendant then told them "that the City was just wasting [its] time, because she was going to cut the locks off as soon as we left

---

[2]The sequence of events would be more logical if the municipal court complaint had issued on September 18, 1987 rather than September 16, 1987, as appears on its face since, as hereafter appears, September 18th was the deadline for termination of occupancy, as well as the date on which padlocks were placed on the trailers by the City and the date on which defendant removed the padlocks. Moreover, there may well not have been a contempt at all until September 18th. We therefore suspect, but cannot verify, that the municipal court complaint was in fact issued on September 18, 1987 after defendant cut the padlocks and that the earlier date appearing thereon was a typographical error.

[3]It appears that this order did not fully comply with the requirements of *R.* 1:10–2 (institution of proceedings) pursuant to which it was apparently entered. There does not seem to have been the required specification of "the acts or omissions alleged to have been contumacious." Nor were the proceedings ever captioned as therein required. We assume that the trial judge regarded the order initiating the contempt proceeding as substantially complying, and defendant does not now argue to the contrary.

anyway." That officer returned at 1:00 p.m. and the padlocks were still in place. However, half an hour later he was advised by his dispatcher that a Housing Authority representative had reported that the padlocks were cut. He was therefore ordered to return to the site and, as he testified,

I stepped from the police car and I asked Gladys, I said, what are you doing. And she said I cut the locks off. She said these trailers belong to me, not the City.

One of the Housing Authority inspectors also testified and reported this conversation with defendant as the trailers were being padlocked:

We actually, Mrs. Jones stated to us, she said go ahead and take care of what you have to do. She said no sooner you put them on, she will cut them off and in the meantime she showed us a pair of lock cutters that she had.

According to that inspector's further testimony, defendant left the site before the padlocking was completed but came to the Housing Authority Office later that day, a visit described as follows:

Mrs. Jones came into the office. She was requesting a copy of the order that had been ordered because there was a page she didn't have, so she came in to the office for a copy of that particular order. However, I told her I could not issue such because we had to contact the Solicitor's Office before we issue any such copies to her.

So, in the meantime, she leaves out and she returns and she informed me, she said I'll be back within an hour with your locks. I'll have cut them off and I'll return them to you.

Defendant then testified on her own behalf, explaining that

This is what I understood. You see, throughout the years, I had a lot of problems with the City and the City had a lot of problems with me and all the orders and judges ruling that I ever see from the judges had a code number on it, a violation number showing where I broke the law. So, on this order, I didn't see this number on that order so I considered that order wasn't legal. I promised to tell the truth, Judge, and I tell the truth. I thought it was something Mr. Fisher had tried to frame up and to get me out of the trailer. That's what I thought, and if I broke the law, sir, I ask you to forgive me and because I was wrong and down through the years, you can look back at my record. I never disobeyed a judge's order. You can look from down in Atlantic City all the way up.

She then reaffirmed that it was only because she believed the order was not legal that she failed to comply with it, that she had not intended to do anything wrong, and that she had cut

the padlocks because she was angry. She further testified that she was prepared to comply with any order entered by the court, would need some more time to find a place to which she could move the trailers, and apologized to the court for disobeying the order, explaining that

> if I was wrong I ask the judge to forgive me, forgive me for disobeying him. I got angry, I guess. The whole thing was I thought it wasn't legal because I didn't see the code number. I can't read and write real good. I know when I see a violation because I had so many of them from the City and I didn't see no violation, I admit it. I thought it wasn't legal and that's why I did it, Judge, and I'm sorry, sir, very sorry, because I like to work and I like to help people.

Based on the foregoing testimony, the trial judge found that defendant "willfully, purposely, deliberately and knowingly and contumaciously defied the order of the court" and added the gratuitous observation that "I suspect she had that intention as she passed through the door leaving on the day I entered the order." He also concluded that the contumacious conduct created a grave risk of harm for the trailer tenants who might have been encouraged thereby to return and noted that

> I have never ever seen a clearer case of someone being 100 percent totally defiant as far as the law and the court is concerned and I can't tolerate it; not I, the court can't tolerate it.

The judge then imposed a county jail sentence of six months acknowledging it to be the maximum available and directed that it be served consecutively to a sentence she was then serving that had been imposed by the municipal court.[4] He agreed, however, to reconsider that sentence if at any time during its service, defendant, while in jail, were to be successful in getting the trailers moved. On December 9, 1987, after defendant had served a portion of the sentence, the trial judge stayed its further service pending appeal, and in January 1988, he entered an order providing her with transcripts for her appeal at public expense by reason of her indigency.

---

[4]While the record does not indicate the nature of the conviction for which the municipal court sentence was imposed or the length of the sentence, we assume that violation of municipal building codes was involved there as well.

On appeal defendant first contends that the contempt proceedings were defective because the judge who conducted them was the same judge whose order had been allegedly contemned. *R.* 1:10–4 is quite specific in this respect, providing that "[e]xcept with the consent of the person charged, the matter may not be heard by the judge allegedly offended or whose order was allegedly contemned." The City argues that defendant's failure to object at trial was tantamount to the consent provided for by the rule and, in any event, constituted a waiver of any right she may have had to have the proceedings conducted by a judge other than the one who entered the order. We are constrained to reject the City's argument.

Explication of our reasons for concluding that the contempt adjudication must be reversed on this ground requires a brief foray into the history and policy of *R.* 1:10 and the legal principles it implements. We begin with *N.J. Dept. of Health v. Roselle*, 34 *N.J.* 331 (1961), in which Chief Justice Weintraub articulated with precision and clarity the nature of the offense of contempt as both a semantical and a substantive matter. The essence of contempt is defiance of judicial authority. In this sense the offense is, therefore, always a public wrong. It may also constitute a private wrong if the contumacious conduct deprives another litigant of a remedy to which he has been judicially declared to be entitled. The teaching of *Roselle* is that the significant difference between the public and the private wrong is not in the nature of the contemnor's conduct but rather whether the object of the proceeding engendered thereby is to vindicate the public wrong or the private wrong. If it is to vindicate the public wrong, the remedy is in the nature of a criminal penalty rendering the proceedings themselves criminal in nature. If the object is to vindicate the private wrong, the remedy is in the nature of a civil sanction and, hence, the proceedings themselves are civil in nature. The labels "civil contempt" and "criminal contempt" are therefore misleading in respect of describing the contumacious conduct since every contempt is criminal in the sense of constituting a

public wrong. But these labels do have utility if they are limited to describing the object of the proceeding, that is, whether it is the public or the private wrong which is being sought to be vindicated. Thus, as Chief Justice Weintraub succinctly explained, "if it is clearly remembered that 'criminal contempt' means a public prosecution for the offense and that 'civil contempt' means only a private proceeding for supplemental relief on behalf of a litigant, the correct procedure readily appears." 34 *N.J.* at 342.

It is also essential to understand that there are two quite distinct routes for prosecution of so-called criminal contempt. A contempt may be prosecuted in the same manner as any other crime by initiation by indictment or accusation and the vouchsafing to the accused of trial by jury—a so-called plenary prosecution.[5] Or it may be prosecuted on the initiation of the court, but still as a criminal proceeding and subject to the process due a criminal proceeding except for initiation by indictment and trial by jury. This is the so-called summary prosecution. Summary prosecution, moreover, itself falls into two further subcategories. First is prosecution of a contempt *in facie curiae*—an offense which requires an immediate response from the court in order to protect its own legitimacy and the integrity of its proceedings. The second is the contempt which occurs out of the presence of the court, typically defiance of a court order. Such a contempt does not implicate the same need of immediacy in judicial response and hence is susceptible to the according of greater procedural protections to the accused than can be reasonably made available in the punishment of a contempt *in facie curiae.*

[5]Prior to the September 1, 1979 adoption of the Criminal Code, *N.J.S.A.* 2C, the "plenary" crime of contempt was included in the general provision of *N.J.S.A.* 2A:85–1, which preserved common law crimes. The crime of contempt is now defined by *N.J.S.A.* 2C:29–9. The court's power to deal summarily with contempt was codified by *N.J.S.A.* 2A:10–1 to –8, deriving from legislation adopted in 1917. *See generally Roselle, supra,* 34 *N.J.* at 340–341.

Our current rules of court dealing with the prosecution of contempt, *R.* 1:10–1 to –5, were originally adopted in 1965 as *R.R.* 4:87–1 to –5 and were drawn in conformance with the *Roselle* explication. In sum, *R.* 1:10–1 addresses the summary prosecution of a criminal contempt *in facie curiae*, *R.* 1:10–2 to –4 govern the summary prosecution of a criminal contempt committed outside the presence of the court, and *R.* 1:10–5 applies to the so-called "civil contempt," that is the private proceeding initiated by a litigant, not by the court, in which supplemental relief is sought. It is, of course, *R.* 1:10–2 to –4, governing the summary prosecution of a contempt outside the presence of the court, which here engage us.[6]

■ The summary prosecution of a contempt committed outside the presence of the court is inherently a highly sensitive matter. As Chief Justice Weintraub pointed out in *Roselle, supra,* 34 *N.J.* at 340, "The historical issue revolved about the power of a court to punish a contempt (other than one in the actual presence of the court) in summary proceeding, *i.e.,* without indictment and trial by jury." And while the historical debate was resolved in favor of the judicial power despite the abuse with which it had from time to time been wielded, nevertheless, in this context, "The contempt process is everywhere acknowledged to be harsh because of its summary nature and the many roles the court plays in the proceeding. The power should be used sparingly." *Id.* at 342–343.

The scrupulous attention to the procedural safeguards embodied by the rules which must consequently be accorded in a proceeding under *R.* 1:10–2 to –4 have been consistently underscored by the courts since *Roselle.* Thus, as Chief Justice Weintraub himself reiterated in *In Re: Ruth M. Buehrer, et al.,* 50 *N.J.* 501, 515–516 (1967),

---

[6]In its order dismissing the proceeding under Title 2C, the trial judge referred to a proceeding under *R.* 1:10–2 as a "civil contempt." This was a misnomer which we believe was not merely a labeling mistake but also embodied a conceptual misunderstanding.

> But since the summary power lends itself to arbitrariness, it should be hemmed in by measures consistent with its mission. To that end, our rules embody sundry restraints. The judge *whose order was allegedly breached may not hear the charge unless the defendant consents;* the contempt process may be instituted only by the court, lest a litigant turn it to private gain; the defendant shall be informed plainly that the proceeding is penal as distinguished from one for the further relief of a litigant; the penal charge may not be tried with a litigant's application for further relief unless the defendant consents; a conviction is reviewable upon appeal both upon the law and the facts, and the appellate court shall give such judgment as it shall deem just. The presumption of innocence of course obtains, and the burden of the prosecution is · to prove guilt beyond a reasonable doubt. Thus the defendant is afforded all the rights of one charged with crime except the right to indictment and to trial by jury. [Emphasis added.]

Elaborating on this theme several years later in *In re Fair Lawn Education Association,* 63 *N.J.* 112, 115 (1973), Chief Justice Weintraub emphasized again that the procedural safeguards embodied in the rules of court were "designed as antidotes" for the risk of the arbitrary exercise of the summary power, explaining further that

> With respect to procedural antidotes, our practice in contempt matters is calculated to limit the risk of arbitrariness and the appearance of arbitrariness. So, *for example, when the charge is a violation of a court order, the penal proceeding may not be heard by the judge whose order was allegedly contemned unless the defendant consents to his sitting. R. 1:10-4.* Thereby obviated is the risk which inhered singularly in the contempt area when the · offended judge sat in judgment of his own charge. For further assurance, *R.* 2:10-4 provides that a summary conviction for contempt shall be reviewable on the facts as well as the law and thus affords a scope of review not available when guilt has been found by a jury. And our rule forbids a single proceeding both to punish for contempt and to give relief to the litigant injured by the contumacious act or omission, unless the defendant consents to that course. The punitive proceeding, which the court alone may initiate, must be plainly marked so that the defendant will know that the aim is to punish him. *R.* 1:10-2, 4, 5. * * * The rules governing criminal trials apply fully, save only indictment and trial by jury. [Emphasis added.]

And in *In Re Yengo,* 84 *N.J.* 111, 121 (1980), *cert. den.* 449 *U.S.* 1124, 101 *S.Ct.* 941, 67 *L.Ed.*2d 110 (1981), Justice Pollock, fully subscribing to the Weintraub doctrine, noted again that

> When the contempt is in the presence of the court, the judge may act summarily without notice or order to show cause. *R.* 1:10–1. On other occasions, the proceedings shall be on notice and on an order for arrest or an order to show cause. *R.* 1:10–2. In addition, the matter may not be heard by

the judge allegedly offended, except with the consent of the person charged. *R.* 1:10–4.

■ The feared arbitrariness to which the summary contempt power is susceptible, particularly when the alleged contempt is committed outside the presence of the court, is a function of "a process in which the court is complainant, prosecutor, judge and executioner." *Buehrer, supra,* 50 *N.J.* at 514. This is, of course, the reason why *R.* 1:10–4 requires the matter to be heard by a judge other than the one whose order was allegedly contemned.[7] As *Yengo* makes clear, it is the fundamental question of whether the judge offended may or may not himself hear the contempt proceeding which gives point to the exercise of determining whether particular actions are contempts *in facie curiae* or not, since it is only a contempt in the presence of the court which is subject to adjudication by the offended judge.

■ We are thus persuaded that the prohibition of *R.* 1:10–4 against the hearing of the contempt proceeding by the judge whose order was allegedly contemned is a critical "procedural antidote" whose withholding renders the proceeding fatally defective. While we acknowledge that this is a procedural requirement subject to waiver, we reject plaintiff's contention that waiver can be found in the failure to object. The rule requires "the consent of the person charged." No such consent was here sought nor given. Nor can defendant be deemed to have waived so important a procedural safeguard by her silence. It is axiomatic that critical rights afforded a defendant in a criminal proceeding—and this was a criminal proceeding albeit summarily conducted—can only be waived knowingly and voluntarily. It is not suggested by this record that defendant

---

[7] *See generally,* expounding on the reasons why the offended judge ought not conduct the contempt hearing except when necessary to continue the orderly progress of trial, the dissenting opinion of Justice Frankfurter in *Sacher v. United States,* 343 *U.S.* 1, 29–30, 72 *S.Ct.* 451, 465, 96 *L.Ed.* 717, 734 (1952) (Frankfurter, J., dissenting).

was ever made aware of her options. In our view, therefore, these proceedings were fundamentally defective and the ensuing order, now appealed from, void.

■ We reject, however, defendant's contention that the court erred in designating the city solicitor to prosecute the matter. *R.* 1:10–4 provides that the proceeding "may be prosecuted on behalf of the court only by the Attorney General, the County Prosecutor of the county, or where the court for good cause designates an attorney, then by the attorney so designated." The important thing is that there be a prosecutor other than the judge. And while a public prosecutor uninvolved in the order allegedly contemned is preferable to a litigant's attorney, the city solicitor here was in fact a public official, and there was adequate good cause to designate him even though it would have been better practice for that good cause to have been stated in the order.

■ We add these further observations. *R.* 2:10–4 requires the appellate court to review every summary conviction by a court for contempt on the law and the facts and to render such judgment as it deems appropriate. We do not do so here because of our conclusion that the conviction is void for procedural reasons. We nevertheless note the substantive problems as well. First, from what appears in the record itself, we have grave concern over the propriety of the sentence imposed. In our view, it was inappropriate to impose the maximum jail term of six months in light of defendant's expressed contrition,[8] her apparent misunderstandings, her promise of future compliance, and the difficulty of her personal situation.

■ We also have concerns about the merits of the conviction. The order itself required various acts by defendant in accordance with the schedule therein prescribed. Defendant was first to secure the vacation of the trailers by all tenants,

---

[8] No finding was made below that it was disingenuous.

who were to leave no later than September 18, 1987. The record does not indicate whether she complied with this directive or not, although it may be inferred from the fact that the city officials padlocked the trailers at 9 a.m. on September 18, 1987 that the tenants were all out by then. Defendant was further ordered to "board up and secure said trailers" and "disconnect any and all utility services to said trailers." The deadline for these actions was also September 18, 1987. The city officials took their action of padlocking the trailers before the deadline was reached since defendant clearly would have had until the end of the business day, if not until midnight of that day, to comply. *See, e.g., United States Steel Corp. v. Director, Div. of Tax.,* 38 *N.J.* 533 (1962); *Loughran v. Jersey City,* 86 *N.J.L.* 442 (Sup.Ct.1914). The padlocking may well then have been premature. Moreover, the order did not expressly give the City the right to exercise that degree of hegemony over defendant's trailers on that date but only directed plaintiff to secure them and disconnect the utility services. It is therefore at least inferable and consistent with the police officer's testimony that defendant's action in cutting the padlocks was not primarily intended to defy the court's underlying order but to reassert her right of ownership over the trailers, which she deemed threatened by the City's use of its own padlocks. The record is certainly completely devoid of any evidence respecting defendant's other conduct in complying with those portions of the court's order requiring specific actions by her by September 18, 1987. We also point out that the trial judge did not expressly apply to his elemental findings the standard of proof beyond a reasonable doubt. In short, were we reviewing the facts on this conviction pursuant to *R.* 2:10–4, we would be hard pressed on this meager record to find that a contempt had been committed beyond a reasonable doubt.

The adjudication of contempt is vacated without prejudice to the right of the court or the City to institute such further

proceedings consistent with this opinion as each may deem appropriate.