235 N.J. Super. 417 (1989)
563 A.2d 55
EAST BRUNSWICK BOARD OF EDUCATION, PLAINTIFF-RESPONDENT.
v.
EAST BRUNSWICK EDUCATION ASSOCIATION; ROSALIE TRIOZZI, INDIVIDUALLY AND IN HER CAPACITY AS PRESIDENT OF EAST BRUNSWICK EDUCATION ASSOCIATION; AND ALL MEMBERS, EMPLOYEES, AGENTS AND REPRESENTATIVES OF THE COLLECTIVE NEGOTIATIONS UNIT REPRESENTED BY EAST BRUNSWICK EDUCATION ASSOCIATION, INDIVIDUALLY AND IN THEIR CAPACITY AS SUCH MEMBERS, EMPLOYEES, AGENTS AND REPRESENTATIVES, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued May 1, 1989.
Decided August 14, 1989.
*418 Before Judges J.H. COLEMAN and D'ANNUNZIO.
Nancy Iris Oxfeld, for defendants-appellants (Klausner, Hunter & Oxfeld, attorneys; Nancy Iris Oxfeld, on the brief).
David B. Rubin, for plaintiff-respondent (Rubin, Rubin & Malgran, attorneys; David B. Rubin, on the brief).
The opinion of the court was delivered by D'ANNUNZIO, J.A.D.
This litigation arises out of a strike by teachers and other school employees which began on October 1, 1984. On the same date, plaintiff East Brunswick Board of Education (Board) filed a complaint with the Chancery Division seeking an injunction and damages against defendant, East Brunswick Education Association (Association) and others. The Chancery Division issued an order to show cause on October 1, 1984, which included a temporary restraining order enjoining defendants "from engaging in the concerted job action ... and from any other concerted refusal to perform services in violation of law."
*419 The next day, October 2, 1984, in response to the Board's motion to enforce litigant's rights, R. 1:10-5, the Chancery Division issued an order finding that defendants were in violation of the October 1 restraining order and ordering that the Association "shall be fined at the rate of $10,000 per day, commencing October 5, 1984, plus such attorneys fees and costs as the plaintiff has incurred in the prosecution of this action" in the event defendants did not comply with the October 1 restraining order by October 5, 1984.
On October 5, 1984, the return date of the original order to show cause, the October 1 restraining order was continued "until further order of the court." The October 5 order also contained a decretal paragraph ordering "that defendant East Brunswick Education Association is sanctioned, in the sum of $10,000 for violating the October 1, 1984 restraining order of this court on October 5, 1984" and "that the sanction ... shall be effective for each day hereafter that said violation continues."
The dispute giving rise to the strike was settled on October 15, 1984 at which time the monetary sanctions imposed on the Association totaled $70,000. Three days earlier, on October 12, 1984, the Chancery Division had ordered the Association to deposit $6,000 with the Clerk of the Superior Court and to continue to deposit all revenues received by it, with certain exceptions, until further order of the court.
On October 3, 1986, the Association transmitted to the Superior Court Clerk $9,350, which brought the total payments by the Association to $70,000, equaling the total sanction imposed for seven days noncompliance with the restraining order. In April 1988, the Board moved for an order releasing the funds on deposit to it. The Association cross-moved for an order "reducing the fine" to $50 a day and returning the balance on deposit to it. On July 25, 1988, the Chancery Division entered a final *420 judgment[1] that the Board was entitled to the fund and ordering "that final judgment be entered in this matter terminating this action." The trial judge stayed the judgment pending appeal.
The Association, relying on N.J. Dept. of Health v. Roselle, 34 N.J. 331 (1961) and Passaic Tp. Bd. of Ed. v. Ed. Ass'n., 222 N.J. Super. 298 (App.Div. 1987) contends that a daily monetary sanction imposed to compel compliance with a court order may not exceed $50 under N.J.S.A. 2A:10-5. That statute, one of eight dealing with contempt of court which constitute chapter 10 of Title 2A, provides:
Any person who shall be adjudged in contempt of the superior court or county court by reason of his disobedience to a judgment, order or process of the court, shall, where the contempt is primarily civil in nature and before he is discharged therefrom, pay to the clerk of the court, for the use of the state or the county, as the case may be, for every such contempt, a sum not exceeding $50 as a fine, to be imposed by the court, together with the costs incurred.
In Roselle, Chief Justice Weintraub wrote extensively about contempt of court and criticized the terminology "criminal contempt" as redundant and "civil contempt" as meaningless. "The word `contempt' signifies a public offense. It refers to a contempt of government; there is no such thing as a contempt of a litigant. The expression `criminal contempt' is as redundant as `criminal crime,' and to talk of `civil contempt' is to talk of `civil crime.'" Roselle, supra 34 N.J. at 337. Thus, contempt is an offense against governmental authority and a proceeding to punish for a contempt is criminal. On the other hand, a proceeding to afford a litigant supplemental relief from an adverse party's failure to obey a court's order is civil, though historically it was referred to as a civil contempt proceeding. Id. at 336-338.
The object of a civil proceeding to afford supplemental relief to a litigant, R. 1:10-5, is to enforce a court's order. Unlike a contempt proceeding, R. 1:10-1 through 4, punishment *421 is not the objective, though a sanction imposed by the court to compel compliance may inflict punishment's sting.
N.J.S.A. 2A:10-5 applies to a civil proceeding in aid of litigant's rights. Roselle, supra at 346. It authorizes "an imposition in the nature of costs in favor of the State or the county to reimburse government for the pecuniary burden imposed by breach of the order and the civil proceeding which that breach precipitated." Ibid.; accord In re Contempt of Carton, 48 N.J. 9, 23 (1966). Thus, the $50 "fine" serves a very limited purpose.
Despite the narrow objective of N.J.S.A. 2A:10-5, the Association contends that it precludes imposition of any additional monetary compliance sanction in a civil proceeding other than one measured by the aggrieved party's damages. Roselle did not so hold. In that case the trial court had denied plaintiff's application to hold defendants in contempt because plaintiff had not carried its burden of proof. Although the Appellate Division found defendant in contempt it did not impose a sanction but reversed for further proceedings in the trial court. The Supreme Court reversed the Appellate Division, holding that "the restraint was too vague to sustain a finding of a violation." Roselle, supra 34 N.J. at 347. Therefore, the impact of N.J.S.A. 2A:10-5 on any available monetary sanction was not before the Court.
Passaic Tp. Bd. of Ed. v. Ed. Ass'n., 222 N.J. Super. 298 (App.Div. 1987), also involved a strike against a school system. The trial court fined each striking employee $500 for October 16, 1985 and two days gross pay for each strike day thereafter. A panel of this court vacated the fines because defendants had not been "adjudicated in contempt after a proceeding conducted in accordance with R. 1:10-2 and 4." Id. at 306. The opinion thereby implied that in a civil proceeding in aid of litigant's rights a monetary sanction not related to the litigant's damages and not levied under N.J.S.A. 2A:10-5 was unavailable to effect compliance.
*422 It can be argued persuasively that Passaic Tp. unduly limits the court's discretion in a civil enforcement proceeding. As Roselle explained, N.J.S.A. 2A:10-5 injects into a civil proceeding the government's interest in achieving some reimbursement, at the intransigent party's expense, of the cost to the public of the enforcement proceeding. This narrow objective does not include the use of the $50 "fine" as a compliance sanction and, therefore, the statute should not be construed as a limitation on available compliance sanctions.
It can also be cogently argued that limiting monetary compliance sanctions to the aggrieved party's actual damages is unworkable because in many cases there are no financial losses. In the context of a teacher's strike for example, the amount saved by not paying striking teachers may exceed the employer's expenses. Moreover, it is often difficult to fully and fairly litigate the financial loss occasioned by a strike in the context of an enforcement application heard during the strike and shortly after it has begun. If an aggrieved party cannot establish financial damage, then, under the Passaic Tp. rationale, incarceration is the only available compliance sanction.
We need not, however, resolve these issues and concerns in the present case because we conclude that the judgment must be reversed on other grounds.
The $10,000 daily sanction was selected arbitrarily. The trial judge did not explain why he selected that amount rather than a smaller or larger amount. Assuming for the purpose of analysis that the amount was not related to the Board's damages and further assuming that a coercive monetary sanction unrelated to damages but in excess of the N.J.S.A. 2A:10-5 fine is permitted, the monetary sanction, nevertheless, must be fashioned in an amount sufficient to sting and force compliance, but must not be so excessive as to constitute ruinous punishment. Cf. Catena v. Seidl, 68 N.J. 224, 229 (1975) (coercive order cannot be used to punish). The court in structuring the sanction must consider the offending party's ability to pay and *423 the sanction's impact on that party in light of its income, status and objectives, as well as the sanction's impact on innocent third parties.
In the present case, the trial court made no such findings and determinations. On October 1, 1984, when the trial court imposed the $10,000 daily sanction it had no evidence regarding the Association's income and assets. Evidence presented on October 9, 1984 indicates that the daily sanction was well beyond the Association's means.
During the June 24, 1988 hearing, the trial court suggested that in selecting the amount of the sanction in 1984 it was approximating the Board's losses. We have carefully reviewed the October 2 transcript and we find no statement by the court to indicate the source of the $10,000 amount. Although a Board representative testified in general terms regarding strike related costs[2] the trial court made no findings as to those costs or the net loss to the Board, if any, occasioned by the strike. Moreover, the amount the Board saved by not paying striking employees[3] was not capable of being established with accuracy at that time.
For the foregoing reasons we conclude that the judgment ordering payment of the escrow fund to the Board must be reversed and the October 2, 1984 order imposing the $10,000 sanction vacated. However, because the Board's claim for *424 damages has never been litigated we remand to the trial court for resolution of the damages claim.
The Board's contention that this appeal should have been filed within 45 days of the October 12, 1984 order is without merit. That order was clearly interlocutory. It merely ordered the Association to make an immediate deposit of $6,000 with the Superior Court Clerk and to continue paying revenue to the Clerk "until further order of the Court." The strike was not over, and the Board's claims for compensatory and punitive damages was outstanding and unresolved as is clearly indicated by this exchange between Mr. Rubin, the Board's attorney, and the court on October 2, 1984:

Mr. Rubin: Is this ruling intended at all to be a ruling on our cause of action on the second count for our complaint ultimately for damages as a result of the strike or will that cause of action be preserved?

The Court: No, that cause of action will still be preserved. This is simply a sanction which is imposed by the Court to interest the, the Education Association to comply with the Court order.
Reversed and remanded for further proceedings consistent with this opinion.
NOTES
[1] The July 25 final judgment appears to have been the only order entered since the Chancery Division's October 12, 1984 order requiring the Association to transmit its revenues to the Superior Court Clerk.
[2] Dr. Seiden, a Board member, testified that on October 2, 1984 the Board was paying substitute teachers $100 per day and that 180 was a "fair estimate" of the number of substitutes on duty that day. He also testified as to the following daily costs: additional security  $4,800; busses to transport substitutes from an emergency parking lot to the school  $600; additional nighttime security lighting  $1,400; substitute custodians  $3,500. These costs totalled $28,300.
[3] Dr. Seiden testified that the bargaining unit consisted of 838 employees, including approximately 500 teachers. He was unable to establish the number of employees participating in the strike at the time of the hearing.